## HEINRICH FRETZ

*v.*

## CARL ROTH et ux.

[Filed January 9th, 1905.]

1. The fact that a husband handed his wife all his earnings from week to week from which to pay the family expenses does not constitute a gift to her of the surplus.

2. Where the title to land was paid for out of such surplus moneys and was taken in the name of the husband and was conveyed to the wife to prevent the husband from encumbering it, the husband is entitled to a decree as against the devisee of the wife.

3. After money belonging to the husband, but deposited in the wife's name, has been distributed pursuant to the residuary clause of her will, the husband cannot recover the same in equity from the beneficiary.

4. The doctrine of *Garnsey* v. *Mundy, 24 N. J. Eq. (9 C. E. Gr.) 243,* applied.

On final hearing upon bill, answer, replication and proofs, in open court.

*Mr. William M. Rysdyk,* for the complainant.

*Mr. Eugene Frederic Beggs,* for the defendants.

GARRISON, V. C.

This is a bill filed by Heinrich Fretz against Carl Roth and wife.

The primary purpose of the bill is to secure an injunction against Carl Roth enjoining him from proceeding with an action of ejectment brought by him against the complainant; its ultimate object is to have it decreed that the lands in question belong to the complainant.

There is also a sum of money, approximating $3,600, received by Carl Roth from the executor of the will of Louisa Fretz, which is claimed by the complainant.

The lands which were the subject of the ejectment suit are situate in Paterson, New Jersey, and the title thereto was vested, at the time of her death, in Louisa Fretz, the wife of the complainant and the mother of the defendant Carl Roth, and the latter claims title to the lands under the residuary clause of the will of Louisa Fretz.

I find the facts as follows: Heinrich Fretz, now fifty-eight years of age, was married on the 14th of September, 1882, in Switzerland, to Louisa Roth. They were natives of Switzerland.

Louisa Roth, at the time of her marriage to the complainant, was the mother of an illegitimate boy, of whom the complainant was not the father. That boy was Carl, the defendant in this suit, and at the time of the marriage of the complainant and Louisa Roth he was about four years of age.

Fretz and his wife lived in Zurick, Switzerland, for about four years after their marriage, and then came, in 1886, to Paterson, New Jersey. When they reached this country they had between them the sum of $20.

The boy Carl did not come with them.

Fretz obtained employment in various places at Paterson, working in factories and dye shops.

His wages at first were $6 a week, and never were higher than $9 a week.

Each week he took his wages and handed them to his wife. There was no expressed agreement between them, though I find there was a tacit understanding, as hereafter described.

As a matter of fact, she took the money and paid all of the expenses of every description, giving him such money as was necessary to pay for his clothing, and depositing the balance in a bank account in her own name. He was ignorant of what she was doing with the money, excepting that he knew, of course, that she was paying all the expenses.

He testifies that he thought she was putting the money in bank, but it is clear from all his evidence that he did not know the fact, and that she never told him. He and the defendant Carl agree that she never told them anything about financial affairs, and always spoke as if she had no money for any pur-

pose, pretending she would be compelled to borrow for any expenditure outside of the daily routine.

In 1890 it was determined to purchase a lot of land in the city of Paterson, and the wife gave to the husband a bank book, and he went to the bank and obtained $580, the purchase-price, and paid it in consideration of the conveyance to him of the lot of land in question.

The title deed to him was dated May 14th, 1890.

About this time there was some talk between them that he should go back to Switzerland on a visit, but learning, as he did, that an old friend of his had died (to see whom had been the main purpose of his proposed visit to Switzerland) he determined not to go, and the wife determined that she would visit her people in the old country.

It is set up in the bill that the conveyance which was made by the husband to the wife (through an intermediary) was made in anticipation of the proposed visit by him to Switzerland, and that the purpose of the conveyance was to vest title in her, so that she would be protected in the event of anything happening to him while traveling.

Since the fact is that the conveyance from the husband to the wife was not made until April, 1891, almost a year after the time when the husband was to have gone, and when the wife actually did go to Switzerland, it is obvious that the statement in the bill does not agree with the facts.

I think that it is probably true that at the time he was contemplating his trip to Switzerland it was suggested that he should make this transfer to his wife for the purpose indicated, but it is quite evident that it was not the purpose which finally induced the conveyance.

That which did induce the conveyance was this:

The wife went to Switzerland about May, 1890.

While the wife was away the husband determined to leave the employment in which he was then engaged in the factory and to purchase a horse and wagon and engage in the peddling of produce.

For this purpose he borrowed the sum of $150, and pledged

the property, which, as we have seen, at this time stood in his name, for the payment of the debt.

After the return of the wife to this country, which was in the month of September, 1890, she learned of this transaction. Just when she learned of it does not appear, but it does appear that the knowledge made her very angry with her husband, and, as he expressed it, "she felt insulted," and she thereupon informed him that he should transfer the title to her, so that he could not, as she expressed it, "take up any more money on the lot."

She consulted a lawyer in the city of Paterson and gave him instructions to prepare deeds which would effect a conveyance of the land from the husband to her.

She arranged and attended to the whole matter. He did nothing excepting to go to the lawyer's office and sign the deed.

The lawyer testifies, "I gave them both to understand what the papers were."

Fretz understands but little of what is said in English.

The deeds were dated April 15th, 1891, from Heinrich Fretz and wife to Herman Sontag, and from Herman Sontag to Louisa Fretz.

The complainant testifies that his wife told him at the time that she would convey the property back to him, or that she would will it to him at her death.

There is also testimony by the complainant, and by other witnesses produced by him, of conversations by the wife, in which she stated that she would will the property to him, or that she would see to it that it was made all right at her death, one witness swearing that she said "the house she couldn't do anything with, because it belongs to Mr. Fretz."

This oral testimony, of course, cannot be used as the basis of a contention that there was an express trust, nor do I think it is sufficient to show a resulting trust, even if this were a case to which the doctrine of a resulting trust otherwise applied.

I do think it relevant and of weight in arriving at the intention and understanding of the parties, and that it shows clearly that there was no gift, and confirms my belief in the rectitude of the conclusion, hereafter stated, that the husband did not

understand that he was stripping himself of his interest in the property.

The title thereafter remained in the wife, and the residuary clause of her will devised all of her real estate to her son, Carl Roth.

On the 5th day of March, 1892, they borrowed the sum of $1,100 and erected upon the land in question a building, in part of which they lived, part of which was rented to lodgers or boarders, and in another part of which they operated a saloon.

The license for the saloon was taken out in the name of the complainant, and the business of the saloon was carried on in his name by both the complainant and his wife, although she, here, as elsewhere, handled all the money.

In 1894 or 1895 he was injured in the dye shop in which he was then working, being affected with blood poisoning, and from that time on he remained at home, assisting his wife in the care of the household—there being boarders—and in the care of the saloon.

He was entitled to receive $5 per week, for eighty weeks, from a beneficial society, and his wife each week went and got this money and kept it.

At the time she came back from Switzerland, in 1890, she brought her son with her, and he lived with the complainant and his wife, on and off, down to the time of his mother's death.

The son testifies that he gave his wages to his mother.

Some little time before her death she quarreled with her son and dismissed him from the house, but shortly before her death she became reconciled to him and he came back to live at the house, and was there at the time of her death.

She was taken ill some five or six weeks before her death, spent some time in a hospital, was removed to her home some two weeks before her death, and during that period consulted with a lawyer about the drawing of her will, and executed the same on the 21st day of September, 1901, and died upon the 29th day of September, 1901.

Her husband supposed she was making a will because she sent for a lawyer, but he knew nothing about its contents.

After the death of the wife the executor named in the will,

Herman Deiser, read the will in English to Carl Roth and to the complainant, and explained it in German to the complainant.

The complainant testifies that the executor told him that he (the complainant) had the real estate and the boy got whatever money there was.

The complainant says he knew nothing about the money, where it was or how much it was, and did not know that his wife kept a bank account; but he says that since he understood from the executor that he had the real estate, he was willing that the boy should have whatever money there was.

It turns out to be the fact that she had on deposit a sum slightly over $3,600.

She willed $500 to her sister and the balance under the residuary clause to her son.

The testimony of Deiser, the executor, is entirely consistent with that of the complainant, although it differs in statement.

He says that he explained to the complainant the contents of the will, and that, in response to a question, as I understood it, from the complainant, he stated to him that the will would not operate upon the real estate if the complainant owned it; and since to the complainant's mind he did own it, it will be seen that these two witnesses are in accord.

There is testimony to show that the complainant paid the taxes assessed against the property and paid the interest upon the $1,100 mortgage.

After the death of his wife the complainant continued to occupy the premises and to carry on the business.

About a year after her death he learned that Carl Roth claimed to own the property, and shortly after that time he was served with a summons and declaration in ejectment.

He thereupon caused the bill in this suit to be filed.

The answer and proofs of the defendants are based upon the contention that the money with which the property was bought was the wife's money; that she was both the legal and equitable owner of the property and of the money deposited in the bank, and that the same passed, under her will, to the defendant Carl Roth.

The first question calling for consideration concerns the conditions existing at the time of the original purchase of the real estate.

If at that time the money which paid for the same was, in law, the money of the wife, then, upon familiar principles, the taking by the husband of the title in his own name would merely serve to constitute him her trustee, and she would be considered the equitable owner, and the subsequent deed to her would be the joining of the legal and equitable estate in her.

On the other hand, if the money at that time was not the property of the wife, then other principles will be applied to the subsequent conveyance of the title from the husband to the wife.

While there is some testimony that for a time the wife did some washing for neighbors, there is nothing to show the amount thus earned or what she did with it.

If she contributed it to the husband or the household, that ends the inquiry.

If she did not, there is still the open question as to the husband's assent to her retaining as her own earnings in a business not carried on separately from him.

A wife who is the sole caretaker of her home, who withdraws her services therefrom to go into other families to perform casual services, cannot be held to have the right, as against her husband, to retain as her own the amounts received for such work.

But for lack of proof that any part of the $580 purchase-price was money earned by the wife, I shall treat the money in question as the earnings of the husband accumulated in the hands of the wife.

Whatever may be held to be the law under other circumstances, I am of opinion that among people of the class to which these people belonged there is no warrant for finding an intention on the part of the husband to make a gift to the wife of his wages which week by week he hands over to her upon pay-night.

There is, in my judgment, no question that if, upon some one of these pay-nights he handed his wages to his wife, and she, turning to anyone present, should give them to such one as a gift from her, the transaction as between her and the stranger

could not be sustained,·as against the husband, as a gift, and the husband could undoubtedly recover the money.

It must therefore be conceded that whatever we call this very usual arrangement among laboring people, it is not in any aspect a gift by the husband to the wife.

. If it is not a gift at the time that the money, week by week, is handed to her, I do not see upon what reasonable theory the excess or surplus which remains in the hands of the wife, after she has paid the current expenses, can be considered a gift.

Among those differently circumstanced, where the wife is largely, if not wholly, ignorant of her husband's business affairs —where he handles all the money; where what she receives from him may properly be said to be from his bounty—the rule of law is reasonable which holds that she is the owner of what she saves out of the moneys he gives her.

But in searching for the intention with respect to transactions among people circumstanced as these people were, I am entirely clear that there is no donative purpose indicated by the weekly handing over by the husband of his wages to his wife.

I am of the opinion that the intention of each of the spouses is the same, and that such intention is that the money which is their all is their joint property.

This is the way that it is dealt with by such people; from it they obtain their sustenance, their shelter, their clothing, what little amusements they can afford to pay for and everything which they are required to expend.

The husband retains no money in his own hands for any purpose, and the joint hoard is theirs for all purposes.

I think that the well-understood and thoroughly-intended purpose of such people is to have a joint hoard to be used for every purpose while each is alive, and to go to the survivor when the other dies. And if it be essential to determine who is the owner in law of such moneys, I incline to the opinion that in law the husband is.

I think, under such circumstances, the wife is the disbursing agent of the husband with absolute discretion, and may freely, during her lifetime, expend the moneys entrusted to her by him; that there may be cases in which, as to the moneys accumulated

by their joint efforts, she acquires a right therein so that they are owners in common and the same should be divided equally between them; that at the death of either their intention is survivorship; but that, unless the facts otherwise indicate, the money thus accumulated in the hands of the wife is the husband's, and she is holding it as agent for him.

If I am right in this conclusion, then the $580 which was in the wife's hands at the time this property was bought, and which was by her given to him and by him paid for the lot, was not the wife's money in any such way as to constitute her the equitable owner of the real estate.

If, then, the husband be considered as having legal and equitable title to this property at the time, in 1891, when he conveyed it to the intermediary who conveyed it to his wife, the next question for consideration is, may he now, upon the facts shown, obtain relief?

In the first place, there is no testimony of a clear and distinct agreement between the parties made at the time of the conveyance, and if there were it could not be taken advantage of by this complainant because of the statute of frauds and of the canon of evidence, which forbids the reception of oral proof to vary written instruments.

I do not think there is a resulting trust.

It does not come within the definition by Lord Hardwicke, in *Lloyd* v. *Spillet, 2 Atk. 148,* nor do I find that there is such a trust as arises where a husband has caused a title to be vested in his wife and overcomes the presumption of an advancement or settlement by proving a different contract.

I am of opinion, however, that this complainant is entitled to relief upon the doctrine established in this state in the case of *Garnsey* v. *Mundy, 24 N. J. Eq. (9 C. E. Gr.) 243 (Chancellor Runyon, 1873),* and since frequently recognized both in this court and in the court of errors and appeals.

This complainant is a man of the very lowest order of intellect. He cannot speak our language, and but imperfectly understands anything that is said to him in English. Even when spoken to in his own language (German) he comprehends

only the simplest statements, and is similarly limited in expressing himself.

He impressed me, while testifying, as a man entirely honest, and I am under the impression that even when read his testimony will carry conviction that the witness is stating the entire truth as he understands it.

In no instance did he seek to color any statement or to give any evidence which would favor him at the expense of truth.

A less truthful man, with more intelligence, would undoubtedly have testified to some statements by the wife, or to some understandings between them which would lead to favorable action in his behalf.

This complainant, however, confined his testimony to a statement of what I believe to have been the truth of the situation.

I think that his sole purpose in transferring the land from his own name to his wife's was to show acquiescence in her purpose to keep the land free from further pledge by him to pay debts.

I mean by this that he, having once borrowed on the strength of the title to this property, and she being angry that what they looked upon as their joint property should be thus encumbered, prevailed upon him to transfer the title to her that this might not occur again.

While it is shown that she paid off the $150 mortgage which he had placed on the lot, it is also shown that the money to do so was derived from the husband's earnings, and that which is held concerning the ownership thereof is applicable to this. Furthermore, there is no pretence that she paid the money as a consideration of the conveyance to her, or that she became mortgagee for the advance of this $150 paid to the existing mortgagee.

The whole case shows that she was a masterful woman, that she ruled both her husband and her son, and in her household and in the business carried on therein she was the master spirit; and in all their money transactions, from the beginning, she was the treasurer.

As has already been explained, this leads me to find that the moneys in her hands, which came from her husband, were not gifts, but were part of the joint hoard, and likewise leads me

to find that in transferring to her the title to the land his purpose was not to make a gift, but to place this also for their joint benefit with her, who in all their transactions was the leading spirit and the conservator of what they were able to gather together for their joint benefit.

I do not think that he had any comprehension, when he signed the deed to the stranger to effect the conveyance of this land to his wife, that in so doing he was giving the land to her, or was enabling her to deprive him of his rights therein; but, on the contrary, I find, from the whole evidence, that his purpose was merely to deprive himself of the temptation or possibility of borrowing money upon the strength of the title to this land standing in his name; and that such purpose generated with her and was by her imposed upon him, and that each intended that the survivor should have the land.

Under such circumstances as I find to exist in this case, our courts have frequently declared that the deed should be set aside.

With respect to the prayer in the bill that the defendant Carl Roth shall be decreed to pay to the complainant the sum of $3,674.41, which was the money found upon deposit in the name of the wife, and which was administered by the executor of the wife's will, my conclusions are as follows:

At the time of the wife's death, this money being on deposit in a bank, there was a chose in action under her control, which passed under her will to the executor. There was no *res* which may be followed by the husband who claims it into the hands of the legatee who obtained it.

Whatever may be or may have been the rights of the complainant to the moneys upon deposit in the name of the wife, I do not see how he can, by this bill, or in a proceeding of this nature, proceed against this defendant.

If it be conceded that at the time of the wife's death this complainant was legally the owner of the funds which were deposited by the wife in her own name in the bank, it seems to me that the complainant must have proceeded against the bank to prevent its paying out the money to the wife's representatives, or against the wife's representatives to contest their right, as

against him, to collect the deposit. But I do not see upon what theory the complainant can in this proceeding raise this contention with this defendant.

In a direct proceeding against the wife's representatives, or against the bank, the real issue would be tried, and defences which might be raised against the complainant's right to this chose in action could then be raised.

Upon this branch of the complainant's bill I find against him, and will so advise.

The authorities which, in my opinion, sustain me in the conclusions reached, are as follows:

There can be no recovery herein upon the theory of an express trust; none is proven, and the lack of a writing manifesting the same is fatal.

This is too familiar and well settled to require citation.

The deed in this case, being upon an expressed consideration, and the uses being declared therein for the grantee, there can be no resulting trust in favor of the grantor. *Coffey* v. *Sullivan,* 63 *N. J. Eq. (18 Dick.) 296* (at *p. 303) (Court of Errors and Appeals, 1901)*; to the citation on *p. 303* thereof, add *Lister* v. *Lister, 35 N. J. Eq. (8 Stew.) 49 (Chancellor Runyon, 1882).*

The cases which hold that the presumption of a settlement upon a wife overcomes the presumption of a resulting trust in circumstances where the husband pays for property which is conveyed to the wife, but that this presumption in favor of the wife may be overcome by proof, do not apply.

This was a direct conveyance from the husband through an intermediary, and the evidence in any event is insufficient to show such a trust. *Duvale* v. *Duvale, 56 N. J. Eq. (11 Dick.) 375 (Court of Errors and Appeals, 1897)*, citing the prior cases.

The transaction, however, is one which falls within the principle of the cases which hold that a voluntary deed by way of gift, settlement or provision, containing no provision for revocation or reversion, comprising substantially all of the donor's property, will be set aside if it be found to be improvident and to have been made by one who did not have the benefit of proper advice and instruction, and did not fully and clearly understand and appreciate the consequences of his act.

The grantor, in the case at bar, was ignorant of our language; the deed conveyed all he had and was absolute and unconditional, and contained no provision for revocation or reversion; he had no advice from anyone, and certainly had no understanding, in the proper sense of that word (*White* v. *White, 60 N. J. Eq. (15 Dick.) 104* (at *p. 115*) (*Vice-Chancellor Pitney, 1900*), as to what the effect of the conveyance was, and certainly there was no intention on his part to absolutely lose his rights in the property.

Under such circumstances the deed cannot stand. *Anderson* v. *Elsworth, 3 Giff. 154; S. C., 7 Jur. (N. S.) 1047; Beard* v. *Beard, 3 Atk. 72; Warlick* v. *White, 86 N. C. 139; Story Eq. Jur.* § *1374; Garnsey* v. *Mundy, 24 N. J. Eq. (9 C. E. Gr.) 243* (*Chancellor Runyon, 1873*), deed of trust; *Mulock* v. *Mulock, 31 N. J. Eq. (4 Stew.) 594* (at *p. 602*) (*Vice-Chancellor Van Fleet, 1879*), absolute deed; *Van Houten* v. *Van Winkle, 46 N. J. Eq. (1 Dick.) 380* (at *p. 385*) (*Chancellor McGill, 1890*); *Martling* v. *Martling, 47 N. J. Eq. (2 Dick.) 122* (at *p. 132*) (*Vice-Chancellor Pitney, 1890*), absolute deed; *Doughty* v. *Miller, 50 N. J. Eq. (5 Dick.) 529* (at *pp. 533, 534*) (*Vice-Chancellor Van Fleet, 1892*), absolute deed, *dicta; Hall* v. *Otterson, 52 N. J. Eq. (7 Dick.) 522* (at *p. 531*) (*Vice-Chancellor Green, 1894*); *White* v. *White, 60 N. J. Eq. (15 Dick.) 104* (*Vice-Chancellor Pitney, 1900*), absolute deed; *Grant* v. *Baird, 61 N. J. Eq. (16 Dick.) 389* (*Vice-Chancellor Pitney, 1901*); *Thorp* v. *Smith, 63 N. J. Eq. (18 Dick.) 70* (at *p. 92*) (*Vice-Chancellor Pitney, 1902*); *Coffey* v. *Sullivan, 63 N. J. Eq. (18 Dick.) 296* (at *p. 302*) (*Court of Errors and Appeals, 1901*), absolute deed; *Collins* v. *Collins, 63 N. J. Eq. (18 Dick.) 602* (*Vice-Chancellor Stevens, 1902*), absolute deed.

With respect to the moneys earned by the husband and turned over by him weekly to the wife, and from which the consideration for the real estate was paid, the question presented is a bald one. I so term it because I do not place my findings upon conversations or spoken explanations of intention, but the sole question is what inference should be drawn from certain facts, or, rather, from a certain line of conduct as between a husband and wife circumstanced as were the parties in this suit.

There is probably no subject which has given rise to more litigation, in the course of which such confusion exists arising from the contradictory opinions of different courts, and sometimes even of the same court. At the expense of some little space, I shall express my view of the law.

At common law, during the existence of a marriage, the husband had the legal control of all of the property without regard to ownership.

But even at common law "there was a latent idea of community between husband and wife which cannot be easily suppressed." *2 Poll. & Mait. Hist. Eng. L. (2d ed.) 407 (*405).*

In the courts of equity there grew up a principle under which it was held that there might be a separate estate in the wife in property during coverture.

This principle, however, and its application to facts, did not change the law with respect to the relations between husband and wife in respect to their dealings with each other.

After this principle was established, as well as before, the husband remained in control of the property without respect to its derivation, excepting such property as was settled upon the wife for her sole and separate use.

Beginning in 1839, certain of the states of the United States passed laws for the better securing to married women of their property, the statute of New Jersey being passed in 1852.

Since there was no model after which each of the states patterned its legislation, there arose, and has since existed, great diversity of opinion concerning the construction of these acts.

Our courts have held that the act is to be strictly construed where the rights of the husband are concerned, upon the theory, I presume, that since it is in derogation of the common law rights of the husband, it will only be held to extend so far as its language requires, and will not be, by construction, stretched further. *Eckert* v. *Reuter, 33 N. J. Law (4 Vr.) 266* (at *p. 268) (Supreme Court, 1869)*, citing prior cases.

Our courts hold that the design of the statute was not to disturb the relation as established at common law between the husband and wife, but was designed to enable the wife to receive

and hold property so that it should not be subject to the control of nor liable for the debts of her husband. "It was not designed to confer upon her the power of acquiring her husband's property, but to protect her own." *Dills* v. *Stevenson, 17 N. J. Eq. (2 C. E. Gr.) 407* (at *p. 413*) (*Chancellor Green, 1864*). "The act confers no power on the wife to take real or personal property directly by gift from her husband" (at *p. 413*).

We must approach the solution of this question, then, as it would have been approached at common law in a court of equity prior to the enactment of the Married Woman's act, holding that the purpose of that act was to secure to the married woman her property free from the control and debts of her husband; but that in an inquiry with respect to the ownership of property once in the husband's ownership the presumptions of law existing prior to the act remain as theretofore. *Winter* v. *Walter, 37 Pa. St. 155; Parvin* v. *Capewell, 45 Pa. St. 89; McDermott's Appeal, 106 Pa. St. 358; Laing* v. *Day, 8 Ill. App. 631; Burns* v. *Bangert, 16 Mo. App. 22; McFerran* v. *Kinney, 22 Mo. App. 554.*

It is too elemental to require citation that where the question of gift is being investigated the intention controls.

I also think that it is elemental that as between husband and wife the very nature of the relationship requires us to pay the slightest heed to the mere fact of possession. *Parvin* v. *Capewell, supra; Rodgers* v. *Campbell, 17 Pa. Co. Ct. 72; Burns* v. *Bangert, supra.*

In a case in our court of chancery, where the fair effect of all the testimony seems to me to be that the wife was in possession of money, which money was shown to have come partly from the income of her separate estate and partly from the savings of the husband, the court disregarded the evidence as to possession and divided the moneys so found equally between the parties. *Bergen, Administrator,* v. *Van Liew et al., Administrators, 36 N. J. Eq. (9 Stew.) 637* (*Court of Errors and Appeals, 1883*).

To determine, therefore, as between husband and wife, the ownership of money, we must first ascertain the source whence it came.

In this case it was the earnings of the husband, week by week, handed to the wife.

Second, we must determine the circumstances under which the money was transferred from the possession of the husband to the possession of the wife.

*Schouler on Husband and Wife p. 422 § 388,* says:

"But the circumstances under which the husband's transfer is made are always material. Thus, a husband might have placed his earnings or property in his wife's hands for safekeeping, and not as a gift to her, in which case title to the fund should be respected accordingly as between them; or it might be regarded perhaps as bestowed for their joint benefit or that of the whole family upon due proof. *Marshal* v. *Crutwell, L. R. 20 Eq. 328; Adlard v. Adlard 65 Ill. 212; Edgerly v. Edgerly, 112 Mass. 175; Seibold v. Christman, 7 Mo. App. 254.*"

And further (on *p. 337 § 293*), he says:

"The wife was formerly supposed also to gain a title to savings out of her housekeeping allowance: *Paul Neal's Case, Prec. in Ch. 44,297.* But see *Tyrrell's Case, Freem. 304.*

"So, where the husband allowed the wife to make profit of butter, eggs, poultry and other farm produce, which allowance he called her 'pin money,' it was held that she acquired a separate ownership therein. *Slanning* v. *Style, 3 P. Wms. 337.*

"But these cases rest upon questionable authority (see *Macq. Husb. & W. 320*), and more recently it has been decided that where the wife of a farmer, with his knowledge and sanction, deposited the produce of the surplus butter, eggs and poultry with a firm in her own name, and he called it 'her money,' and on his death-bed gave his executor directions to remove the money and do the best he could with it for his wife, such evidence was insufficient to establish a gift between them, and that the husband had made neither the firm nor himself trustee for his wife. *Mews* v. *Mews, 15 Beav. 529.* See *McLean* v. *Longlands, 5 Ves. 78,* cited herein with approval. And see *Rider* v. *Hulse, 33 Barb. 264,* for a similar American decision."

The later English cases are in favor of the husband's title— *Hoyes* v. *Kindersley, 2 Sm. & G. 195 (Vice-Chancellor Stuart, 1854); Barrack* v. *M'Culloch, 3 Kay & J. 110 (Vice-Chancellor Wood, 1856); Lloyd* v. *Pughe, 42 Law Jour. Ch. (N. S.) 282 (1872); Marshal* v. *Crutwell, L. R. 20 Eq. 328 (Master of Rolls Jessel, 1875)*—as are the following cases in the courts of this country: *In re Estate of Gracie, 24 Pittsb. L. J. 9;*

*Rodgers* v. *Campbell, 17 Pa. Co. Ct. 72; McDermott's Appeal, 106 Pa. St. 358; Aaronson* v. *McCauley, 19 N. Y. Sup. 690; Adlard* v. *Adlard, 65 Ill. 212.*

Since we are searching for intention and are applying the presumptions of the law in a case between husband and wife, and, as intimated, have reached the conclusion that mere possession as between them is but slight, if any, evidence of ownership, I am inclined to the opinion that where a wife deposits in a bank, in her own name, money which at the time of its deposit would, as between them, be determined by the court to belong to him, the mere fact of the deposit is of little, if any, weight in determining the question of ownership.

I think it is clear that in the receipt of these weekly sums from the husband she was his agent for the purpose of disbursing the same, and, in that view, what remained was his, in her hands as his agent. See cases last cited.

The mere fact that she, for safekeeping, placed these funds in a bank in her own name, to my mind, throws no light whatever upon the question of intention as between the husband and wife.

I do not wish to be understood as deciding that in a case where there is other evidence of intention or other circumstances to be considered, that the fact that the wife has, with her husband's knowledge, deposited money in a bank in her own name may not be of great weight, but I do mean that in a case presenting the bald question I am here dealing with, the conclusion that the money remaining in the hands of the wife each week, after paying all the expenses of the family, was the husband's, leads us still to consider it his, notwithstanding that she, without his direction, or, as is shown in this case, without ever telling him, deposits it in a bank in her own name.

The following cases discuss and illustrate the principle: *Lloyd* v. *Pughe, 42 Law Jour. Ch. 282; L. R. 8 Ch. 88; 28 L. T. (N. S.) 250; 21 W. R. 346; Marshal* v. *Crutwell, 44 Law Jour. Ch. 504; L. R. 20 Eq. 328; Mews* v. *Mews, 15 Beav. 529; In re Estate of Gracie, 24 Pittsb. L. J. 9; Rodgers* v. *Campbell, 17 Pa. Co. Ct. 72; Appeal of McDermott, 106 Pa. St. 358; 51 Am. Rep. 526.*

If objection be taken that the theory upon which the bill was framed and that upon which relief is granted vary, and it be found that such is the case, the court will still sustain the bill and grant the relief, if the relief granted be within the scope of the bill and the evidence justifies it, even if it be found necessary to amend the bill and prayer. *Aller* v. *Crouter,* *64 N. J. Eq.* (*19 Dick.*) *381* (at *p. 387*) (*Chancellor Magie, 1903*) ; *Archer* v. *American Water Works Co., 50 N. J. Eq.* (*5 Dick.*) *33* (at *p. 48*) (*Chancellor McGill, 1892*).

I have determined to exercise the discretion vested in the court by not allowing either party costs as against the other. The complainant succeeds as to part of his bill and fails as to part, and, furthermore, the defendant merely sought to obtain by a suit at law that which on the face of the record was his, and which he therefore was entitled to proceed to obtain.

Under these circumstances I think it just that the defendant should not be visited with costs.

I will advise a decree that the injunction be made perpetual against the ejectment suit, and that the deeds from the complainant to Herman Sontag and from Herman Sontag to Louisa Fretz be declared and decreed to be void, and that the defendants be directed to convey the title to the complainant.