FRANK FRICK, Plaintiff, *v.* NEWELL K. CONE, as Executor, etc., of JOSEPHINE FRICK, Deceased, and Others, Defendants.

Supreme Court, Genesee County, September 9, 1936.

*George E. Phillies* [*Albert J. Waterman* of counsel], for the plaintiff.

*Newell K. Cone*, executor, etc., defendant in person.

*Woodworth & Brown*, for the defendants Isabelle Musty and Mary A. Musty.

*Leslie G. Dinsbier*, for the defendants Alfred Musty, Adele Metz, Helen M. Richardson, Rose C. Metz and Viola Henbert.

*Newman & Newman*, for the defendants Robert Musty, Eugene Musty, Marian G. Musty, Walter Raymond Musty and Geraldine Musty Marzolf.

*J. H. Herman*, for the defendants Mary M. Conrad, Louise Fountain, Julia Ambrust, Frank Ambrust and John Ambrust.

*James R. Hanley*, for the defendants Arthur Bauer and Raymond Bauer.

HORTON (CLINTON T.), Official Referee. This is an action by Frank Frick against the executor of the estate of his deceased wife, Josephine Frick, to compel conveyance to plaintiff in fulfillment of an oral trust made by decedent by the terms of which she is alleged to have taken title to property for her husband under agreement to convey to him at any time.

In 1895 plaintiff, at the age of thirty-six, married decedent, a widow then forty-five years of age with two children, Augustus, about twenty-two years old, and Sarah, about seventeen. The former died of tuberculosis within a few months after the marriage. At the time of his death his mother borrowed about $200 to defray his funeral expenses, and plaintiff settled his bills in Buffalo where he had been attending business college. Sarah lived with the Fricks for seventeen years. She was a sickly girl afflicted with tuberculosis, and was under a doctor's care for five or six years before her death in 1912.

Josephine died August 21, 1934, leaving a will dated June 13, 1918, whereby she left her entire estate to her brothers, sisters, nephews and niece, named as defendants in this action, subject to a life estate in Frank Frick, her husband. Her estate consisted of four pieces of real estate in Batavia valued at some $14,000, and eight mortgages dated from October 1, 1926, to June 9, 1934, aggregating $12,700, besides one of $3,000 paid and discharged after her death, with other small assets, the estate netting about $27,000.

Plaintiff claims that all this rightfully belongs to him, as he says it all accrued from his earnings and that title thereto was taken by his wife for convenience and protection to him in his business pursuant to an oral agreement resulting in the trust above referred to. The defendants, on the other hand, contend that the estate is the increment of certain inheritances of Josephine enhanced by her earnings; that Frank never worked to any extent to earn his living; that his earnings, if any, were a gift *inter vivos* to his wife and that his claim is unenforcible under the Statute of Frauds.

The issues thus raised require a careful analysis of the evidence. It appears that in 1895, some eight months before her marriage to plaintiff, Josephine sold a farm for $4,700, receiving as part payment a mortgage of $2,700 payable $200 per year. In 1903 this was assigned, the balance then being $1,200. She also received

from November, 1904, to October, 1912, five payments as legatee of the estate of an aunt totaling $2,111.89. Her lack of funds when her son died in 1895 compels the inference that the cash payment upon the farm was used to pay debts, and leaves us to determine whether this estate of $27,000 which was accumulated in the years came from the $4,700 received by her as above mentioned, with its increment, or whether it accrued out of the property owned by Frick at the time of his marriage and his subsequent earnings and their increment. After a careful consideration of all the evidence I am satisfied that I must adopt the latter alternative and find that the estate left by decedent was produced by her husband, the plaintiff. Two funerals and the maintenance of a sickly girl for seventeen years, with the medical expenses incident to treatment of tuberculosis for five or six years, were sufficient to exhaust the separate estate of decedent. I am not at all satisfied that the decedent added anything to her separatd estate through the keeping of roomers or boarders. I cannot take seriously the evidence of the neighbor who testified that during the last six or seven years of her lifetime deceased had a houseful of roomers, as deceased was, at the beginning of that period, a woman seventy-seven or seventy-eight years of age and was not in good health. The other evidence as to this and to the claim that Frick hardly ever worked to earn anything comes from interested witnesses and is of no particular consequence.

An examination of the statement of the bank accounts and of the dates of the acquisition of various properties and mortgages, shows that the substantial increase in the estate came after 1910. This was during the period of Frick's greatest earnings, which, according to the evidence, aggregated some $65,000 in the thirty years up to 1929 when he retired. During those thirty years he was active as a building contractor and carpenter whose services were much in demand. His working hours extended from morning until late in the evening. He built houses, bought vacant lots, erected houses thereon and bought and reconstructed old houses, selling the same and making substantial profits thereby. The evidence that he was an industrious, careful and thrifty man is convincing, and there is no doubt in my mind that the estate left by his wife upon her death was the result of his enterprise and the accumulation of his savings.

The next question to be determined is: what was the understanding of the parties when Frick turned his earnings over to his wife. Was it the intention that the title should vest in her absolutely without any ownership or control of it by him, or was it delivered to her for purpose of defraying the·proper family expenses and saving the

balance for the person who produced it? Because of the statutory prohibition plaintiff could not testify as to the agreement or circumstances under which these payments were made. There is, however, direct evidence as to this from several witnesses of high standing in the community to whose testimony I attach great importance. One of these testified that both Mr. and Mrs. Frick told him they were saving the money for their old age so that they could live easily and were putting it in mortgages. Another stated that on five or six different occasions, when properties were purchased, Mrs. Frick said, " It is Frank's money paying for that. * * * I will take the title in my name and any time that Frank wants it back I will deed it back." The same witness, who had known the Fricks since 1898, testified that the substance of the agreement made by Mr. and Mrs. Frick in his presence, was " that on account of the liability * * * he [Frick] might be subject to, in the business " as a contractor, he could " protect himself from his creditors by putting it [the property] in his wife's name." Another testified that Mrs. Frick said, " Frank works very hard. He makes the money, but I save it for him." Still another stated that she told him from time to time that Frank was very industrious and wanted to get all the work he could, that she was trying to save the money for him all the time that he was earning it. I am impressed with the testimony of these witnesses and with the documentary proof.

It is not unusual for a husband to keep his savings or investments in the wife's name for the protection of the family from unforeseen reverses. Such arrangement has received judicial approval in cases where interests of creditors, purchasers or incumbrancers are not involved adversely. The courts often uphold the rights of the actual owner as against the claim of the title holder. (*Schwab* v. *Schwab*, 177 App. Div. 246; *Bartos* v. *Bartos*, 138 Misc. 117; *Lennon* v. *Lennon*, 240 App. Div. 755.)

The defendants contend that the plaintiff's earnings were meager, if any at all. There is no partial claim against the estate by the defendants. They claim all of it. The record is devoid of evidence to show that any part of the wife's $4,800 was invested in the real estate to which she held title, and I cannot believe that this amount, which, except on two occasions, came in driblets of about $200 a year from 1895 to 1912, would be sufficient, under the circumstances of this case, to maintain two children and defray their funeral expenses and, ultimately, unaided, to produce a surplus of $27,000. What, then, became of Frick's earnings amounting to about $65,000 and of some savings which he had before his marriage in 1895? If the assets were the result of her property it would seem that the increase would be more evident within a reasonable

time after marriage in 1895 and not after Frank had reached the peak of his earning capacity. All of these circumstances, viewed in their collective significance, convince me that the estate is the fruit of his earnings and savings and they should remain his unless an intent to make of it a gift *inter vivos* clearly appears from the evidence in the case. In this connection see *Matter of Ekins* (126 Misc. 1), in which Judge WHEELER said:

" There are numerous authorities bearing directly or indirectly on the question as to whether moneys turned over to a wife by a husband under circumstances such as appear in this case are to be treated as a gift. In 21 Cyc. 1296, it is stated that:

" ' The fact that the husband handed to his wife all his earnings from week to week from which to pay the family expenses does not constitute a gift to her of any surplus over such expenses ' (citing in support of the statement, *Fretz* v. *Roth,* 68 N. J. Eq. 516; 59 Atl. 676).

" Under such circumstances the inference is that the money still belongs to the husband. *Rodgers* v. *Campbell,* 4 Pa. Dist. R. 614; *Lane* v. *Lane,* 76 Maine, 521; *Countryman* v. *Countryman,* 28 N. Y. Supp. 258; *Neufville* v. *Thomson,* 3 Edw. Ch. 92."

The only proof to support the claim of gift *inter vivos* is the bare fact that legal title was in the name of the wife. It is argued that a presumption arises in favor of a gift to the wife. This presumption, of course, is rebuttable. The intention of the husband is a thing to be looked for. (*Matter of Blumenthal,* 236 N. Y. 448; *Schwab* v. *Schwab,* 177 App. Div. 246; *Vincent* v. *Rix,* 248 N. Y. 76.)

The taking of the title in the wife's name was definitely qualified and explained by testimony of undeniable credence. Some significance must be attached to the failure of the defendants to produce further proof as to this. (*Sinclair* v. *Purdy,* 235 N. Y. 245, 251; *Matter of Sherman,* 227 id. 350, 353.)

To establish a valid gift the evidence taken as a whole must be inconsistent with any other design on part of the donor. (*Matter of Green,* 247 App. Div. 540.)

Reverting to the proof required from the alleged donees when evidence is offered to rebut the presumption of gift above referred to, the court said (*Matter of Gramm,* 157 Misc. 676, 679): " A donee has the burden of establishing an alleged gift. The maximum that can be said concerning the proof on the part of respondent is that deceased might have given him the property. That does not suffice. Respondent has failed to sustain the burden which is his."

And in *Matter of Booth* (215 App. Div. 516, 521) it was stated: " Proof of a gift must be clear, convincing and satisfactory (*Matter of Van Alstyne,* 207 N. Y. 298, 306; *Ward* v. *New York Life*

*Ins. Co.*, 225 id. 314; *Matter of Sherman*, 227 id. 350), especially in view of the relationship here established. In *Ross* v. *Ross* (6 Hun, 80) the court said: 'A court of equity interposes its benign jurisdiction to set aside instruments executed between persons standing in relations of parent and child, guardian and ward, physician and patient, solicitor and client, and in various other relations in which one party is so situate as to exercise a controlling influence over the will and conduct and interests of another; and this power will be exercised unless the instrument is satisfactorily shown to be fair and free from improper influence by the party seeking its benefit, the burden of which rest upon him. (*Mason* v. *Ring*, 2 Abb. Pr. [N. S.] 322; *Sears* v. *Shafer*, 6 N. Y. 268; *Comstock* v. *Comstock*, 57 Barb. 453; *Evans* v. *Ellis*, 5 Den. 640; *Howell* v. *Ransom*, 11 Paige, 538; *Brock* v. *Barnes, Exr.*, 40 Barb. 521; Story's Eq. Jur. §§ 309 to 315.) ' "

It seems to be well established by the authorities that in order to consummate a gift *inter vivos* there must be (a) delivery of the thing by the donor; (b) intent on his part to divest himself of the title absolutely; (c) an irrevocable act of the donor creating the gift; (d) possession by the donee; (e) absolute control and dominion by the donee; and (f) vesting unrestricted title in donee and not any transaction creating joint possession in donor and donee. (*Matter of Green*, 247 App. Div. 540; *Young* v. *Young*, 80 N. Y. 422; *Beaver* v. *Beaver*, 117 id. 421; *Matter of Van Alstyne*, 207 id. 298; *Matter of Moran*, 136 Misc. 615; *Foreman* v. *Foreman*, 251 N. Y. 237.)

In this case plaintiff delivered his property or earnings to his wife. All the other requisites for a valid gift were absent in that the property was turned over to the donee upon an agreement to convey to the donor, no investments were made without his approval, several properties were sold and mortgages collected and the proceeds thereof were deposited in the joint account subject to withdrawal by either party, he rented properties, collected rents, paid taxes, built houses upon vacant lots, remodeled some of the houses which enhanced the value of the estate, attended to the banking, signed checks and otherwise exercised unrestricted control over the property. These positive actions deprive the transaction of its elements as the creation of a gift. The dominion that goes with ownership was in effect always his. It is significant also that after his wife's death he delivered to the executor the key to his own safe deposit box where all the mortgages, bonds, deeds, searches and other indicia of title were held. These affirmative acts carry with them the inference that the donor never intended to give to his wife unqualified dominion and control of his property.

Equity will not permit that plaintiff, who, by his industry and thrift, has built up a substantial estate, should be stripped of his property in his old age, and deprived of its enjoyment or the right of disposition of it unless a searching scrutiny of all the facts convinces the court that such was the clear intention of the parties and that no injustice is done. The relation between husband and wife is of the most confidential nature. The measures of protection flowing from the affection of a husband must not be used as an instrumentality of fraud against him. A mere provisional arrangement to secure comfort for future days and to protect the welfare of the family should not be converted into a license to wrong him. (*Gallagher* v. *Gallagher*, 135 App. Div. 457; affd., 202 N. Y. 572; *Boyd* v. *De La Montagnie*, 73 id. 498; *Haack* v. *Weicken*, 118 id. 67; *Lamb* v. *Lamb*, 18 App. Div. 250; *Kovner* v. *Kovner*, 134 Misc. 631.)

I find from the evidence in this case that plaintiff put the title of his property in his wife's name upon her promise to deed it back whenever he wanted it and that during all her married life she unequivocally confirmed this promise when occasion required the selling of the various properties. Sharing possession of the property with her husband, suffering him to make valuable improvements thereto, giving him its income, selling some of the properties of which she was the title holder and depositing the proceeds thereof in the joint account, together with the amounts received from mortgages and permitting him to withdraw the same from such account without restriction as to amount or purpose, keeping in his safe deposit box the indicia of ownership, are unequivocally acts of partial performance and supply the key to what constitutes a promise that she was holding the property for the husband as trustee and not as a donee — it was on part of the husband the case of a confidence induced not by the bare promise, but by the promise and the confidential relation conjoined. I am satisfied that the intention of the parties in holding the title in the wife's name, was to protect his savings from unforeseen reverses during the time that he was engaged as a contractor, building or overhauling houses. Mrs. Frick clearly understood, before she took the title to the first piece of property that she was to become the custodian of it, that " Frank ' was ' putting his money in and if anything happens Frank ' would ' have something to fall back on." This was not the typical isolated transaction where the wife took title to the home of the parties as a gift, expressly or by acquiescence. It was clearly an arrangement of continuity whereby the husband, active in business ventures for years, relying on the word, honor and promise of his wife, carried on his business in her name, thus affording security

to himself during his lifetime and advantage to the wife after his death.

"He found, as he thought, in the bond of kinship a protection as potent as any that could be assured to him by covenants of title." (*Sinclair* v. *Purdy*, 235 N. Y. 245.) It seems to me that to deny him redress, for the benefit and unjust enrichment of his wife's relatives, would be a reproach upon equity.

Under these circumstances I can see no alternative but to find that a constructive trust was created under the authorities holding that such arises where confidential relations would be abused if there were repudiation without redress of a trust orally declared. (*Fraw Realty Co.* v. *Natanson*, 261 N. Y. 396; *Gallagher* v. *Gallagher*, 135 App. Div. 457; *Goldsmith* v. *Goldsmith*, 145 N. Y. 313.)

Actual fraud need not be shown in cases of this kind, but only constructive fraud which exists in "any act of omission or commission which is contrary to legal or equitable duty, or trust or confidence justly reposed, and which is contrary to good conscience and operates to the injury of another. * * * the motive is immaterial and may even have been consistent with an innocent intention." (Black, Rescission of Contracts and Cancellation of Written Instruments, vol. 1, § 22. See *Matter of Smith*, 243 App. Div. 348; *Kelly* v. *Kelly*, 116 Misc. 195; *Wood* v. *Rabe*, 96 N. Y. 414, 422.)

The oral agreement is enforcible notwithstanding the Statute of Frauds. As stated by POUND, J., in *McKenna* v. *Meehan* (248 N. Y. 206, at p. 214): "If the Statute of Frauds had been pleaded, the question would still remain whether there had been such an abuse of a confidential relation as to lead without a writing to the implication of a trust. (*Sinclair* v. *Purdy*, 235 N. Y. 245.) Equity gives relief on the ground of the perpetration of fraud independe: tly of the Statute of Frauds. If such relief is granted, the legal estate remains in the grantee but equity holds her to the performance of her verbal agreement. A constructive trust is declared to hold and sell which fastens itself on the property. In cases of established fraud, where the conveyance is not set aside and the trust is not executed automatically by the provisions of the statute, equity will suffer the title to rest in the fraudulent grantee as trustee *ex maleficio* to execute the trust in accordance with its terms. (*Wood* v. *Rabe*, 96 N. Y. 414, 422.)"

And Judge CARDOZO in *Foreman* v. *Foreman* (251 N. Y. 237) says: "The husband paid for the land and managed and improved it. The wife, far from attempting to rid herself of the trust because orally declared, submitted to it as completely as if seals and parchments had perfected the evidence of duty (cf. *Bork* v. *Martin*,

132 N. Y. 280). No objection was heard from her, or none that has been disclosed, when the husband gathered in the rents and used them for himself. In its origin the trust was dependent for proof of its existence on nothing better than word of mouth. In the end, at her death, what was oral in its beginnings, had been confirmed by part performance, with the result that conduct as well as words had become the signs of its creation (*Jeremiah* v. *Pitcher*, 26 App. Div. 402; affd., 163 N. Y. 574; *McKinley* v. *Hessen*, 202 N. Y. 24; *Burns* v. *McCormick*, 233 N. Y. 230). The wife would have been guilty of an abuse of confidence by disclaimer during life. Her heir will not be suffered to nullify her submission to the call of equity and honor by disclaimer after death."

Fraud is never presumed. The burden of establishing it, as a general proposition, rests upon him who asserts it, but that rule changes in cases where a fiduciary relation exists between the parties to a transaction, such as husband and wife, and where it is charged that one of the parties has obtained a possible benefit through constructive fraud. In such cases, equity raises a presumption against the validity of the transaction and casts upon the dominant party the burden of proving its honesty and integrity and thereby overcoming such inference. (*Matter of Smith*, 243 App. Div. 348; *Hayes* v. *Kerr*, 19 id. 91; *Butler* v. *Prentiss*, 158 N. Y. 49; *Allen* v. *LaVaud*, 213 id. 322; *Cowee* v. *Cornell*, 75 id. 91.)

I have given considerable thought to the question as to whether any part of this property could be said equitably to belong to her estate. From the facts as I find them, as outlined above, the answer must be in the negative. She was never gainfully employed, her bank account was closed without balance before her death, whereas the joint account was open and active, her inheritances from her own relatives had been exhausted for many years and I am compelled to conclude that she held all of this property at her death as trustee for her husband and that he is entitled to the relief demanded in the complaint.

Findings and judgment may be prepared in accordance with the above, without costs.