In the Matter of the Estate of MARY McCARTHY, Deceased.

Surrogate's Court, New York County, August 23, 1937.

*Paul T. Davis*, for the executor.

*Sullivan, Donovan & Heenehan [Edmond M. Hanrahan* of counsel], for the respondent.

DELEHANTY, S. In this discovery proceeding the executor of deceased seeks to recover money which concededly was originally the property of deceased and concededly passed into possession of respondent.

The original account was solely in the name of deceased. It was closed on July 14, 1936, having then a balance of $6,580.65. On that day a new account was opened in the same bank entitled " Mary McCarthy Mary Donaghy Jt. acct. payable to either or survivor." The draft which closed the sole account of deceased seems to have been prepared in the bank by some one who wrote on it the amount of the closing balance in the sole account and also the names of the payees " 1. Mary McCarthy 2. Mary Donaghy." To the left of these names in small print are the words " in joint account subject to the rules and regulations of said bank governing such accounts." Opposite the place for the signature of the depositor on the draft in ink was " M. McC sign " with an arrow pointing to the place of signature. All the writing on the draft (except deceased's signature) seems to be in the same hand. On July 14, 1936, also, a signature card was signed by deceased. To the left of her signature in large print are the words, " Joint Account." Above the signature in fine print are the words, " We hereby assent to the By-laws and Rules of The Greenwich Savings Bank." The pedigree or test declarations on the card seem to be wholly in the hand of respondent both as respects deceased and as respects respondent, who also signed the new card underneath deceased's name. Drafts were drawn on this account on July 21, 1936, for $98; on July 27, 1936, for $185.79; on July 30, 1936, for $148.30; on August 3, 1936, for $142.45, and on August 3, 1936, for $6,006.11. This last draft exhausted the account. All drafts after the new account was opened were drawn by respondent. The final draft for $6,006.11 was paid by a teller's check to the order of respondent who, without the knowledge of deceased and without notice to deceased, deposited it in a commercial account in respondent's sole name.

Deceased entered the hospital on July 10, 1936. She underwent an operation for cancer on July 14, 1936, the day the new account was opened. On or about August 3, 1936 (the date when respondent withdraw the entire balance in the new account), the attending physician told respondent that deceased's case was hope-

less.  He went on vacation leaving another physician in charge and saying to respondent that nothing more could be done for deceased. Death, in fact, occurred on August 14, 1936.  Deceased signed the draft of July 14, 1936, on her sole account and the signature card of the new account on the day of her operation and while actually in the hospital.

Respondent's answer deals factually with the accounts and her handling of the funds.  The answer sets up no defense of gift *inter vivos* in so many words, but in the course of the trial such claim was advanced, and it is now urged in respondent's brief. She does not rest alone on that claim, but asserts a right as survivor to retain the funds placed in joint tenancy.

The only evidence offered in support of the alleged gift is that of a sister of respondent.  She reports a conversation between deceased and respondent as follows: " My aunt asked Mary if she had done anything about the bank account and Mary said no that she hadn't done anything; so Aunt Mary said ' Well I want you to have this money because I haven't remembered you in the will and I want you to take this bank — the money in this bank and put it in your own name ' and Mary said that she would go to the bank Monday and find out, and Aunt Mary before she said that, Aunt Mary said ' I am going to write your name across the front of this bankbook ' and then Mary said ' Well, no, that won't do, but I will go down Monday and ask the bank what to do about it ' and Aunt Mary said ' Well, now, you are talking sense about the matter.' "  The witness said that deceased had the bank book in her hand and gave it to respondent and then the witness left the room and heard nothing further about the book.  This talk was on Sunday, July 12, 1936.  On Monday, July 13, 1936, respondent cashed a draft for $100, which was dated Sunday, July 12, 1936, and was drawn by deceased to respondent's order on what was still deceased's sole account.  Whatever inquiry respondent made on that Monday must have resulted in the preparation of the papers which deceased signed on Tuesday.  Even if the oral testimony recited above is accepted as true, it fails to establish any gift.  The witness did not hear the last of the incident.  The actual conduct of respondent respecting the book negatives the conclusion now sought to be drawn from the oral testimony.  Her procurement on Monday of the draft and the signature cards for the new account demonstrates that she did not receive the book as a gift.

The conditions to be fulfilled for a valid gift are (1) an intention on the part of the donor to give, (2) delivery to or for the donee of the thing given, (3) a *present* change from donor to donee of exclusive and absolute dominion and ownership of the subject-matter

of the gift, and (4) acceptance by the donee. (*Beaver* v. *Beaver*, 117 N. Y. 421, 428, 429; *Matter of Van Alstyne*, 207 id. 298, 308; *Frick* v. *Cone*, 160 Misc. 450, 456.) " A gift cannot be made by creating a joint possession of donor and donee." (*Young* v. *Young*, 80 N. Y. 422, 431.) " A gift to take effect in the future is void as a promise without consideration." (*Matter of Green*, 247 App. Div. 540, 544.) At the time the book was handed to respondent there was no present change from deceased to respondent of entire dominion over the fund in dispute. On her own showing respondent did not accept the book as in symbolic form a present gift of the fund which it represented. Indeed, respondent's proof is to the effect that after this alleged incident at the hospital concerning the bank book respondent went home and sought out her mother for advice concerning her future actions respecting the bank account. Not only respondent's conduct on July fourteenth but this testimony as well is irreconcilable with the theory that a gift *inter vivos* had been previously completed at the hospital. The court holds that no gift *inter vivos* of the book or the fund was made by deceased.

There remains to be considered the claim that respondent secured title to the fund by right of survivorship. Section 249 of the Banking Law provides that where a deposit in a savings bank is in the form of a joint account the money involved belongs to the depositors as joint tenants and " the making of the deposit in such form shall, in the absence of fraud or undue influence, be conclusive evidence, in any action or proceeding, to which either such savings bank or the surviving depositor is a party, of the intention of both depositors to vest title to such deposit and the additions thereto in such survivor." The import of this section is that " as between the depositors themselves the form of the deposit gives rise to a presumption and nothing more, but that after the death of either *leaving a deposit then subsisting* the presumption becomes conclusive as to the title of the survivor." (CARDOZO, Ch. J., in *Moskowitz* v. *Marrow*, 251 N. Y. 380, 397.) (Italics supplied.) But if on the death of one depositor it develops that the other had already withdrawn some or all of the fund, the form of the account no longer raises as to such withdrawals a conclusive presumption in favor of the survivor, and becomes " a mere presumption in respect of any moneys previously withdrawn." (*Marrow* v. *Moskowitz*, 255 N. Y. 219, 221.) The effect of withdrawal of the money by respondent prior to the death of deceased was to " open the door to competent evidence, if any was available, that the tenancy created at the opening of the account was in truth something different from the tenancy defined by the presumption." (*Marrow* v. *Moskowitz*, *supra*, p. 222.)

It is necessary first to ascertain whether deceased ever concurred in opening with her sole money a joint account which vested in respondent on July 14, 1936, the *immediate* interest of a joint tenant. Did deceased on that date understand and concur in a transaction which permitted respondent *immediately* to withdraw and keep as her own one-half of $6,580 ? At any time either of two joint tenants can destroy the joint tenancy and appropriate his share to his sole use and like destruction may be effected by common action of the tenants, by assignment or transfer by one of them, by legal action or by successive appropriations not exceeding a moiety. (*Matter of Suter*, 258 N. Y. 104, 106; *Moskowitz* v. *Marrow*, 251 id. 380; *Matter of Porianda*, 256 id. 423; *Loker* v. *Edmans*, 204 App. Div. 223; *Rush* v. *Rush*, 144 Misc. 489.) Did deceased understand that when the balance in the account was drawn on to pay her medical and hospital bills, she was drawing on her moiety (one-half of $6,580), and that if respondent desired to do so she could take her half ($3,290) out of whatever balance was left should deceased recover from her illness? It is impossible to believe so.

One who asserts that another has given him a joint interest in funds is asserting a gift and takes the burden of establishing the gift by clear and convincing evidence. In respect of *the gift of a joint interest* there is no proof whatever except the draft and the signature card signed by deceased on July 14, 1936. The form of each has been set out in detail earlier in this decision. They leave respondent's proof of this gift fatally defective. Nowhere is there any proof that decedent knew that she was doing more than giving respondent power to draw on the account for deceased's needs. The fact that the arrangement coincided with deceased's operation and her consequent inability to attend to her own affiairs makes it practically certain that all that deceased intended was to provide a method for payment of her bills. Deceased was at the time wholly dependent on respondent and relied entirely on respondent. Such dependence and reliance are urged by respondent in support of the alleged outright gift. In such circumstances the advantage gained by respondent over deceased is not enforcible. (*Allen* v. *La Vaud*, 213 N. Y. 322.) An *inter vivos* transaction benefiting respondent is presumptively void. No evidence here rebuts that presumption.

The defect in respondent's proof is more fundamental, however. The draft and signature card refer in one instance to " the rules and regulations of said bank governing such accounts," and in the other instance to " the By-laws and Rules of The Greenwich Savings Bank." No rules and regulations and no by-laws were

shown to deceased. The fine-print " Joint account " in one case and the large-print " Joint account " in the other carry no dictionary of their meaning. The proof indicated that deceased never saw the new deposit book which carries the label " Jt. Acct. payable to either or survivor." Even if she had there would still be lacking any proof that deceased was aware that in the transaction respondent acquired an *indestructible* half interest in $6,580. Deceased signed no bank ledger card and acknowledged nowhere any knowledge of the by-laws and regulations of the bank concerning joint accounts. So, the fundamentals were not shown. (*Matter of Fenelon,* 262 N. Y. 57.) Form creates presumption only when conscious acquiescence in the form and the meaning of it is first shown. That acquiescence was found in the *Fenelon* case by the showing that the depositor there subscribed a ledger card beneath the legend " A joint account with right of survivorship payable to either of the undersigned depositors or the survivor is hereby created and the bank is notified accordingly." (*Matter of Fenelon,* 262 N. Y. 308.) The authority of the earlier *Fenelon* opinion (reported at 262 N. Y. 57) remains unshaken on the necessity of a fundamental showing of conscious creation of an account having the incidents attaching to joint ownership.

The fund having been withdrawn by respondent prior to deceased's death there came into operation further legal principles. It is apparent, of course, that in the eleven-day interval between the secret withdrawal of the fund and the death of deceased any one of the multitude of hazards to human life might have resulted in the death of respondent before that of deceased. Even on assumption of the existence of a joint account the withdrawal was a fraud. It destroys the presumption on which alone respondent's claim as survivor rests. It opens the door to inquire as to the real intent of the parties in the transactions of July 14, 1936. That real intent is shown to be the intent to put respondent in a position where she could handle deceased's funds for deceased's account; and nothing more. Deceased's illness, her own draft for $100 to respondent's order on July 12, 1936, deceased's operation on July 14, 1936, respondent's use of the money for deceased's needs thereafter, respondent's meticulous record of her expenditures (even to the noting of thirty cents spent for mouthwash), and respondent's repeated admissions of the real nature of her contact with deceased's money, all compel this conclusion.

The court holds (1) that no outright gift of the bank book or the money represented thereby was made by deceased; (2) that deceased did not consciously change the account into one giving the rights of a joint tenant to respondent, and (3) that respondent

was the agent only of deceased in the handling of the account and had no right of survivorship therein.

Accordingly respondent is held accountable to the estate of deceased for the balance in her hands. She handled a total of $6,680.65. Of this amount she received $100 by draft to her order cashed on July 13, 1936. She received $6,580.65 through the joint account. Her testimony shows that she spent for nurses and hospital charges $939.32. She claims to have spent $503.72 further. Of this amount dispute exists as to $253 listed as " miscellaneous for funeral and sundry expenses previous thereto." She submitted a revised schedule in support of this item and reduced her claim to $180.35. The court feels that an allowance of $125 is liberal for the items she schedules. Accordingly, she is credited with (a) $939.32; (b) $250.72 ($503.72 — $253), and (c) $125, or a total of $1,315.04. This leaves her chargeable with a balance of $5,365.61 of principal. Interest will be charged on this balance from August 14, 1936, the date of death of the owner of the funds.

Submit, on notice, decree accordingly.