[Civ. No. 12745. First Dist., Div. One. May 16, 1946.]

CHAS. A. BLISS, Appellant, v. IRENE MARTIN, Respondent.

Joseph C. Prior for Appellant.

Pierre A. Fontaine and J. Leonard Rose for Respondent.

WARD, J.—This is an action wherein appellant seeks to recover from respondent, as constructive trustee, certain funds, originally the property of Lulu H. Coffin, deceased, placed by said Lulu H. Coffin, formerly Lulu H. Montgomery, in joint

tenancy with plaintiff, Chas. A. Bliss. The appeal is presented in the form of a bill of exceptions with a stipulation to the effect that the evidence, minute orders, etc., contained therein, are true and correct.

The bill of exceptions contains the following: "Plaintiff was duly sworn and testified that he was the plaintiff in said action; that he was an attorney at law, and had been such for over forty years; that he had known one Lulu H. Montgomery during all of that time, and had acted as one of her attorneys from 1911 until her death, on September 8th, 1937, and that a confidential relationship existed between them during most of said time; plaintiff residing at Sacramento, California, and she at Oakland; that said Lulu H. Montgomery at various times informed plaintiff that for services rendered and to be rendered by plaintiff she desired to create joint tenancy bank accounts between herself and plaintiff and did cause certain joint tenancy bank accounts to be established by the execution by both of said persons of written agreements, and the deposit of moneys in bank in said joint accounts.

"That on July 17, 1926 said Lulu H. Montgomery, also known as L. H. Brown, owned and possessed herself alone in the name of L. H. Brown, a savings account No. 92674 in the Central Bank of Oakland, and which said account No. 92674 was created and opened in said Central Bank in herself alone under the name of L. H. Brown on August 5, 1921 with an initial deposit of $7243.00; that the balance in said savings account No. 92674 on July 17, 1926 was the sum of $14,563.45." The account in accordance with a new local bank system was changed and transferred on July 17, 1926, to account No. 42,950. It should be noted that Lulu H. Coffin, in the real estate business, over a number of years opened savings accounts with different relatives and friends under various assumed names. The names assumed by the joint tenants generally bore some resemblance to the true names of the parties. Whether this procedure was for tax or other business purposes is of no consequence in the outcome of this case, except in tracing various accounts. Plaintiff knew that Lulu H. Coffin used various names as three other accounts were opened with him under the names of Lulu H. Montgomery, L. H. Brown and Hannah Brown. These accounts likewise provided that the money might be withdrawn by either party without reference to "original ownership." Other accounts in other banks were opened with plaintiff. Some of the accounts

were closed out prior to the death of Lulu H. Coffin, and some were subsequently paid by the banks to appellant Bliss.

The bill of exceptions relates: "That on June 27, 1927 said Savings Account No. 42950 was changed from a single account in said name of L. H. Brown to an account in the names of L. H. Brown or Chas. A. Bliss in joint tenancy. That plaintiff's Exhibit No. 1 consists of two separate and distinct signature cards affecting said Account No. 92674 transferred by said Central Bank on July 17, 1926 to said new Savings Account No. 42950, and a Deposit Agreement affecting said new Savings Account No. 42950 dated June 27, 1927 and signed by said L. H. Brown and said Chas. A. Bliss. . . ." The deposit agreement provided: "All moneys now or at any time deposited by us or either of us, with Central Savings Bank of Oakland, to the credit of the above account, are and shall be so deposited by us and received by it upon the following terms and conditions of repayment, namely; that the amount thereof and all dividends thereon shall be paid by Central Savings Bank of Oakland, to us or either of us, or to the survivor of us, or the executors, administrators or assigns of such survivors; or upon the written order of any such person so entitled to payment; and without reference to the original ownership of the moneys deposited."

The bill of exceptions continues: "That on May 27, 1929 said L. H. Montgomery, also known as L. H. Brown, without the knowledge or consent of said plaintiff, withdrew from said Savings Account No. 42950 the sum of $17,714.94 and thereby closed said Account No. 42950. That at no time did said plaintiff deposit or contribute to or withdraw any moneys from said Account No. 92674 which was changed by said Central Bank on July 17, 1926 to said Account No. 42950, nor did said plaintiff at any time deposit or contribute to or withdraw any moneys from said Account No. 42950; that on May 27, 1929 said Lulu H. Montgomery owned and possessed a joint savings Account No. 31104 in said Central Bank in the name of herself, Lulu H. Montgomery, or Fannie Frances Alpi, her sister, and which said Account No. 31104 was created and opened by said Lulu H. Montgomery with said bank in the manner aforesaid on October 9, 1928 with an initial deposit of $50.18 and that on May 27, 1929 said Lulu H. Montgomery, without the knowledge or consent of plaintiff, deposited in said Savings Account No. 31104 the said sum of $17,714.94 which she had withdrawn on May 27, 1929 from said Savings Account

No. 42950. That plaintiff had full faith and confidence in said Lulu H. Montgomery and never inquired at the said Central Bank to ascertain if said Lulu H. Montgomery had withdrawn any of said funds from said Account No. 42950 although plaintiff at all times could have inquired into and examined said Account No. 42950 to ascertain if said Lulu H. Montgomery had withdrawn any funds therefrom. . . ."

Lulu H. Coffin had joint bank accounts with other persons than plaintiff. Some of the names appear as Laura Frances Dunnigan, Laura Alpi and Fannie Frances Alpi. The accounts were closed out by Lulu H. Coffin under whatever name she used.

The bill of exceptions further sets forth "That at the time of the death of said Lulu H. Montgomery, to-wit: on September 8, 1937, said Lulu H. Montgomery owned and possessed a joint savings account No. 78410 with said Central Bank under the name of Jean Watts or Irene Martin, defendant herein, which Account No. 78410 was created and opened by said Lulu H. Montgomery with said bank in the manner aforesaid on July 3, 1935 with an initial deposit of $5000.00, and that the balance in said account No. 78410 on September 8, 1937 was $8225.74." Similar accounts with defendant existed at the time of the death of Lulu H. Coffin with the joint tenants listed as "Fannie A. Brown or Jennie Miller," "Lulu B. Anderson or Ruth Rogers," "Lulu A. Anderson or Ruth Rogers," "Jean Watts or Jennie Miller," "Fannie A. Brown or Ruth Miller."

Standing in the names of decedent and defendant as Fannie A. Brown or Ruth Miller was a joint safe deposit box at the Central Bank. The bill of exceptions states: "That on September 16, 1937 said safe deposit box No. 13726 at the request of said plaintiff, as aforesaid, was opened and its contents *seen by* John R. Ober, deputy treasurer of said Alameda County *and said plaintiff*, and plaintiff testified that at that time, to-wit: September 16, 1937, *he first learned that said Account No. 42950 had been closed by said Lulu H. Montgomery*.

"That on September 16, 1937 there was among the contents of said safe deposit box No. 13726, the bank pass book of said savings Account No. 92674, later changed by said Central Bank to said Account No. 42950, and which said bank pass book showed the withdrawal therefrom by said Lulu H. Montgomery on May 27, 1929 of said sum of $17,714.94 and which

said bank pass book was then and there, to-wit: on September 16, 1937, seen *and could have been examined* by said plaintiff in the presence of said Deputy Treasurer John R. Ober. . . .'' (Emphasis added.) The bill of exceptions then lists the various pass books material to this case as documents that were seen and could have been examined by appellant at that time.

Finally, the bill of exceptions sets forth: ''That prior to March 13, 1940, other than his signing on June 27, 1927 of a joint tenancy card with said Lulu H. Brown as joint tenant in Account No. 42950, plaintiff did not assert any claim to any of said savings Accounts Nos. 92674, later changed to 42950, 31104, 78410, 58979, 38768, 3519 or 3520 or to any of the funds or moneys contained in said accounts or either of them.

''That at no time did said plaintiff deposit or contribute or withdraw any moneys to or from said Accounts Nos. 31104, 78410, 58979, 38768, 3519 or 3520 or any of them.

''That by the agreement and conduct of said plaintiff as such executor, said plaintiff as such executor treated and regarded said Accounts Nos. 78410, 58979, 38768, 3519 and 3520 and the moneys and funds therein contained as the property of said defendant and *permitted said defendant upon his sanction, approval and direction* as such executor, to withdraw, use and enjoy all moneys and funds from said Accounts Nos. 78410, 58979, 38768, 3519 and 3520, *and said plaintiff as such executor made demand upon said defendant and in compliance with said demand said defendant did pay her share of State Inheritance Tax and Federal Estate Tax on the moneys contained in said savings Accounts Nos. 78410, 58979, 38768, 3519* and 3520.'' (Emphasis added.) It is true plaintiff testified that he made only a cursory examination of the savings account books at the time the safe deposit box was opened. Plaintiff testified that he observed on September 16, 1937, that the book showing Account No. 42950 indicated that all funds therein had been withdrawn on May 27, 1929.

On the basis of the foregoing facts with respect to plaintiff's rights against the accounts in the names of decedent and defendant the court found, not that a confidential relationship existed between the parties but that during the period appellant acted as Mrs. Coffin's attorney that ''his relation with her was confidential.'' The court also found ''That on May 27, 1929 said Lulu H. Montgomery, also known as L. H. Brown, without the knowledge or consent of plaintiff, withdrew from said savings account No. 42950 the sum of $17,714.94 and thereby closed said account No. 42950;

"That at no time did said plaintiff deposit or contribute or withdraw any moneys to or from said account No. 92674 which was changed by said bank on July 17, 1926 to said account No. 42950 as aforesaid." The findings then trace the funds removed in 1926 to other accounts existing at the time of Mrs. Coffin's death in the names of defendant and decedent. Without repetition herein as to the particular accounts the court specifically designated the accounts by number, amount, date, etc., and found that in each instance the "pass book was then and there, to-wit: on September 16, 1937 seen and could have been examined by said plaintiff." The findings then relate that as executor plaintiff delivered the respective bank books to the defendant and permitted defendant to withdraw the respective balances and close the accounts. The court also found that since June 27, 1927, "plaintiff did have the means of knowledge and notice" of the original account and of the condition of the deposits and withdrawals up to the date the account was closed, and that "on September 16, 1937 and at all times thereafter said plaintiff did have the means of knowledge and notice of said savings accounts . . . [in the names of defendant and decedent] and of the condition of said accounts and each of them and of the moneys contained in said accounts and each of them."

The court, as a conclusion of law, found that plaintiff was guilty of laches and that the action is barred by the provisions of subdivision 4 of section 338 of the Code of Civil Procedure, which was pleaded by defendant. If the provisions of subdivision 4 of section 338 may be invoked, the subject of laches need not be considered. The subdivision of the section provides that an action for relief on the ground of fraud or mistake must be commenced within three years, and further provides: "The cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party, of the facts constituting the fraud or mistake."

Appellant has evolved a theory which, upon examination, appears to be quite involved. Briefly, it is that the statute of limitations could not commence to operate until appellant gained knowledge of facts from which he could trace the disposition of the funds to respondent. Appellant then sets the date of October 14, 1937, the date of his appointment as executor, as the date when he was able to trace the funds. It seems to be appellant's theory that it was his appointment as executor that gave him the legal right to check decedent's bank

accounts. Defendant and decedent under fictitious names owned the right to a safety deposit box. All of the bank pass books on documentary form, giving a complete history of the various transactions, was available to appellant to examine when he opened that safe deposit box. Appellant did not deny on the witness stand that he could have thoroughly examined the accounts on September 16, 1937. His position is that his examination was cursory. There is a suggestion that appellant did not desire to take action against respondent while he acted as executor. It was stipulated as a fact in the bill of exceptions "that plaintiff was still acting as executor of the decedent's estate, when this action was filed on October 11, 1940."

Each side approached the appeal in statements to the effect that the problem to be decided is when did plaintiff discover the fact that the money, deposited in joint tenancy by Lulu H. Coffin under the names of L. H. Brown and Chas. A. Bliss, had been withdrawn by Mrs. Coffin and deposited in the various accounts here considered. Appellant asserts that this is the sole question to be decided, but that the date of discovery is October 14, 1937, the date upon which plaintiff was appointed the executor of Mrs. Coffin's estate. Respondent accepts the challenge and proceeds to demonstrate that the finding that appellant saw and could have examined the various bank books is supported by the testimony of appellant that he actually examined the account numbered 42,950 and that such bank book showed that "all funds therein had been withdrawn."

"Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." (Civ. Code, § 19.) The duty of "pleading and proving" that a fraud was not discovered until within three years prior to the filing of a complaint, and that he had "no actual or presumptive knowledge of facts sufficient to put him on inquiry" is on the plaintiff. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 437 [159 P.2d 958].) Whether a certain circumstance within the knowledge of an alleged defrauded party is sufficient to make it a duty of such person to investigate *is a question of fact* to be determined by the jury or the trial court. The court had the right to consider the fact that appellant as a lawyer was well aware of his legal rights under the statute of limitations (*Hobart* v. *Hobart*

*Estate Co., supra*) and his duty to investigate. The trial court here had before it the testimony of appellant that the bank pass book was examined by appellant on September 16, 1937. The bank book, an exhibit in this case, shows eight entries, the last one of which was the withdrawal of the entire balance. No more convincing evidence could be presented than the documentary evidence that the money was gone ''to arouse the suspicions of a reasonable person.'' (*Hobart* v. *Hobart Estate Co., supra*, p. 442.) In appellant's closing brief, the following statement is made: ''He did look at the book covering account No. 42,950 and saw that all the funds had been withdrawn.'' With equal ease he could have found that in account No. 31,104, in the name of Lulu H. Montgomery and her sister, there was deposited on the same date the identical amount withdrawn from account No. 42,950. Such evidence at least falls within the rule announced in the Hobart case—that an inquiry must be made if the party alleged to be defrauded ''is aware of facts which would make a reasonably prudent person suspicious.'' (*Hobart* v. *Hobart Estate Co., supra*, p. 438; see, also, *Scafidi* v. *Western Loan & Bldg. Co.*, 72 Cal.App.2d 550 [165 P.2d 260], petition for hearing in Supreme Court denied.) In the Hobart case the fraud was not discovered at one time, nor could it have been discovered at one time. Hobart only learned of the fraud from time to time. Here the discovery that a fraud had been committed when Mrs. Coffin withdrew the money was made immediately when the safe deposit box was opened—the entire fraud was discovered just as soon as appellant found out the entire account had been withdrawn.

It has been suggested that a new cause of action arose with each successive transfer of money held originally in the joint tenancy account, and that such causes of action shall not be deemed to have accrued until the original joint tenant has means of knowledge relative to each successive transfer. Even assuming this theory is correct it is admitted that on September 16, 1937, the appellant here saw that his account had been closed and that there were innumerable other accounts in which the decedent had an interest prior to her death. It can not be said that the trial court was unjustified in concluding that appellant had ''knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud [i.e., the transfer into the account with defendant].'' (*Hobart·* v. *Hobart Estate Co., supra*, p. 437.) It is true that here, although

the means of discovery were available to plaintiff at an earlier date as found by the trial court, prior to his examination of the safe deposit box the circumstances were not such that appellant had a duty to inquire so that his failure so to do became a negligent omission during that time. However, it should not be said that the trial court's determination putting him under a duty as of September 16, 1937, was erroneous as a matter of law, even under this theory, where it appears that plaintiff saw the other bank books. The determination that his duty to inquire started at that date is supported by the evidence that he knew of decedent's proclivities for having accounts in fictitious names, her habit of having many accounts and that the money in the joint account in his name had been withdrawn. To give this theory of successive fraudulent acts any greater weight in determining the date this cause of action was discovered within section 338(4) would require that June, 1939—the date appellant selected as the date that he *actually obtained knowledge* that the funds had been transferred to respondent—be selected as the date from which the statute started to run. The admission of appellant that on October 14, 1937, the statute of limitations actually started to run would be worthless. The facts in this case warrant the application of the recent rule that the statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud. (Civ. Code, § 19; *Hobart* v. *Hobart Estate Co., supra.*) However, there is nothing in the Hobart case which compels this court to go contrary to the conclusions of the trial court with respect to means of knowledge and suspicious circumstances where the conclusion of the trial court is based on facts susceptible to conflicting inferences.

In view of all the circumstances supporting the finding of the court, it should not be said by an appellate court as a matter of law or as a matter of fact that the statute of limitations did not commence to run from September 16, 1937.

The judgment is affirmed.

Knight, J., concurred.

PETERS, P. J.—I dissent. The majority opinion holds that plaintiff gained knowledge of facts sufficient to put a reasonable person under a duty to investigate on September 16, 1937, and for that reason it holds that the complaint filed on October 11, 1940, was filed twenty-five days after the period

prescribed in section 338, subdivision 4, of the Code of Civil Procedure had elapsed. This holding is made in spite of the fact that on the day thus selected to start the running of the statute of limitations the plaintiff had no legal right to the possession of the bank books that were his sole source of knowledge, and had no legal right to make inquiry at the banks concerning the bank accounts in question. The plaintiff had no legal right to the possession of the books and had no legal right to make inquiry at the banks concerning accounts not his own until October 14, 1937, and did not, in fact, ascertain the true facts until June of 1939. It is at once obvious that the earliest possible date that the statute could start to run was October 14, 1937, and that the complaint filed on October 11, 1940, was filed three days before the statute had run. The majority holding, in my opinion, is based upon a failure to realize that the cause of action here involved is one against the donee of a fraudulent trustee, and not one against the fraudulent trustee. We are not required to determine in this case when plaintiff first learned that Mrs. Coffin was fraudulent, but are required to ascertain when he first learned, or should have learned, or was put upon inquiry, that he had a cause of action against this defendant, the donee of the fraudulent trustee. That is the cause of action here involved. To select September 16, 1937, as the date plaintiff was first put upon inquiry that he might have a cause of action against defendant not only results in a holding that the statute was running from September 16, 1937, to October 14, 1937, a period of twenty-eight days during which plaintiff was legally powerless to investigate, but also, in my opinion, disregards the rules of law announced in *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958].

The solution of the problem here involved turns upon a careful analysis of the facts, and upon a careful analysis of the exact nature of the cause of action here pleaded. The majority opinion states most of the pertinent facts but fails to analyze or even to discuss the exact legal nature of the cause of action here pleaded.

Plaintiff is an attorney at law and has practiced at his profession for many years. During the years here involved he resided in Sacramento. For many years he knew, was friendly with, and was attorney for Mrs. Lulu H. Coffin, formerly Lulu H. Montgomery, whose maiden name was Lulu H. Brown, who resided in Oakland. He continued to act as one of Mrs. Coffin's

attorneys until her death on September 8, 1937. He testified that during this period a confidential relationship existed between them, and that at various times she had informed him that for services rendered and to be rendered by him she desired to create a joint tenancy bank account between her and him. She carried out this promise on June 27, 1927. On that date, and for some time prior thereto, she owned, under her maiden name of Lulu H. Brown, a savings account number 42,950 (formerly account number 92,674) in the Central Bank of Oakland. On that date there was on deposit in this account the sum of $16,370.86. On that date this account was changed into an account in the names of L. H. Brown (the maiden name of Mrs. Coffin) and Chas. A. Bliss, the plaintiff. The signature card relating to this account and dated June 27, 1927, was signed by L. H. Brown and Chas. A. Bliss. The Deposit Agreement relating to this account, and dated the same day, reads as follows:

"Deposit Account No. 42950

"L. H. Brown or Chas. A. Bliss

"All moneys now or at any time deposited by us or either of us, with Central Savings Bank of Oakland, to the credit of the above account, are and shall be so deposited by us and received by it upon the following terms and conditions of repayment, namely: that the amount thereof and all dividends thereon shall be paid by Central Savings Bank of Oakland, to us or either of us, or to the survivor of us, or the executors, administrators or assigns of such survivors; or upon the written order of any such person so entitled to payment; and without reference to the original ownership of the moneys deposited.

June 27, 1927 L. H. Brown
Oakland, Cal. Chas. A. Bliss"

The plaintiff at no time deposited in, contributed to, or withdrew from, this account. Mrs. Coffin made certain further deposits in this account so that by May 27, 1929, there was a $17,714.94 balance. On that date, without the knowledge or consent of the plaintiff, Mrs. Coffin withdrew all of the money in this account and it was closed. At this time Mrs. Coffin had another joint account in the same bank, No. 31,104, in her then name of Lulu H. Montgomery and the name of Fannie Frances Alpi, her sister. On May 27, 1929, there was a small balance in that account. On the same day that the account with plaintiff was closed Mrs. Coffin deposited in the joint

account with her sister, $17,714.94, the exact amount withdrawn from the account with plaintiff. The plaintiff testified that at no time prior to the death of Mrs. Coffin did he ever make inquiry at the bank concerning his account, for the reason that at all times he had full faith and confidence in Mrs. Coffin and had no reason to distrust her or to believe that she had closed their account. Until her death he had no actual knowledge his account had been closed.

By July 3, 1935, the joint account with her sister, No. 31,104, had increased so that the balance was then $25,061.04. On that date Mrs. Coffin withdrew $17,385.25 from that account and on July 6, 1935, withdrew an additional $6,000. On July 3, 1935, Mrs. Coffin opened three accounts with the Central Bank in her name and in the name of defendant, each with an initial deposit of $5,000. These accounts were numbered 78,410, 58,979, and 38,768. As to No. 78,410 Mrs. Coffin used a fictitious name, but defendant used her real name. As to the other two accounts both Mrs. Coffin and defendant used fictitious names. At the time of Mrs. Coffin's death on September 8, 1937, there was a balance in No. 78,410 of $8,225.74; in No. 58,979 of $8,225.74; and in No. 38,768 of $8,225.48.

On July 5, 1935, defendant opened with the Bank of America two $3,000 joint accounts in defendant's and her names, which accounts were numbered 3,519 and 3,520. Both Mrs. Coffin and defendant used fictitious names as to these accounts. At the date of Mrs. Coffin's death the balance in each account was $3,129.52.

These five accounts are the subject matter of the present action, it being the theory of plaintiff that Mrs. Coffin wrongfully withdrew the money from their joint account and that that money found its way into the five accounts in which defendant was the surviving joint tenant. It is the theory of plaintiff that if he can trace the money he may hold the defendant as constructive trustee.

Mrs. Coffin had certain other joint accounts with various other persons not here involved, and a couple of other quite small joint accounts with plaintiff. At the time of her death she owned with defendant a joint safe deposit box in the Central Bank. She and defendant used fictitious names in securing this box. Mrs. Coffin died testate. By her will she named the plaintiff executor. On September 16, 1937, which is the date selected by the majority as the date the statute of limitations started to run, plaintiff, who had not yet been

appointed executor, requested the county treasurer to open the safe deposit box for the purpose of examining its contents. The box was opened on that date in the presence of a deputy treasurer and plaintiff. Among other things in the box were a number of bank books, including the pass books for accounts Nos. 42,950 (plaintiff's account), 31,104 (the Alpi account), and the five pass books numbered 78,410, 58,979, 38,768, 3,519 and 3,520, in the names (most of which were fictitious) of Mrs. Coffin and defendant, and other bank books for other accounts. These bank books were seen by the plaintiff on this date. It was on this date that plaintiff first secured actual knowledge that all the money had been withdrawn from account No. 42,950 and that that account had been closed in 1929. He testified that at the time the box was opened he made only a cursory examination of the bank books because he knew, not having been appointed executor, that he was not yet entitled to their possession. Moreover, he stated what was the obvious fact that, although he then knew his account had been closed, he could not then tell what disposition had been made of the funds.

The plaintiff was appointed executor of the estate on October 14, 1937, the second key date involved in this appeal. On this date the contents of the safe deposit box were delivered to him. This action was commenced October 11, 1940, the third key date here involved.

The plaintiff testified that after being appointed executor he began a systematic search of all of the banks in Oakland to locate all bank accounts belonging to deceased regardless of the fictitious names she may have used. On February 7, 1939, as executor, he addressed a letter to the Central Bank asking that a full record of all accounts, identifying them by number, be given to him. The bank sent him copies of their deposit and withdrawal records relating to these accounts, but added that it was impossible to trace, through the bank records, the origin of any particular account. In June of 1939 he first became convinced that the money in defendant's accounts was the money withdrawn from his joint tenancy account and he made a formal demand upon defendant in March of 1940.

There is one other factor that should be mentioned. The plaintiff, as executor of the estate, determined that defendant was the surviving joint tenant of accounts Nos. 78,410, 58,979, 38,768, 3,519 and 3,520, and as executor delivered the pass books to defendant on February 9th and 10th, 1938. Defendant

immediately withdrew the money. There was some dispute over the state inheritance and the federal estate taxes on these accounts. Defendant, at the request of plaintiff as executor, paid her share of such taxes, and in June of 1938 a compromise agreement relating to such taxes was approved by the probate court.

The trial court found, as pointed out in the majority opinion, that plaintiff's cause of action was barred by laches and by the provisions of section 338, subdivision 4, of the Code of Civil Procedure. It also found that plaintiff's relationship with Mrs. Coffin was confidential; that on June 27, 1927, account No. 42,950 was changed from Mrs. Coffin's name to the names of Mrs. Coffin and plaintiff in joint tenancy; that on May 27, 1929, without the knowledge or consent of plaintiff, Mrs. Coffin withdrew the money from this account and deposited it in account No. 31,104; that on July 3rd and July 6th, 1935, Mrs. Coffin withdrew a total of $23,385.25 from this account without the knowledge or consent of plaintiff and opened up the five accounts with defendant; that plaintiff was not aware of the existence of the Coffin-defendant joint accounts until after the death of Mrs. Coffin; that at all times since June 27, 1927, the plaintiff had the means of knowledge and notice of account No. 42,950 and of the deposits and withdrawals in said account. The same finding of knowledge and notice was made as to account No. 31,104 since it was opened on May 27, 1929. The court then found that on September 16, 1937, the date the safe deposit box was opened, the plaintiff had the means of knowledge and notice of the five Coffin-defendant accounts and the moneys contained in them; that plaintiff first asserted his claim to the various accounts on March 13, 1940; that by the agreement and conduct of plaintiff as executor of the Coffin estate plaintiff treated and regarded the five Coffin-defendant accounts as the property of defendant, and permitted defendant to withdraw, use and enjoy the money contained in these accounts; that the funds in the five Coffin-defendant accounts came from the funds and accruals originally deposited in account No. 42,950.

In accordance with these findings, judgment was entered for defendant.

It is important to note that the trial court found that the original Coffin-plaintiff account was in joint tenancy. The form of the deposit agreement supports this finding. (*Wallace* v.

*Riley,* 23 Cal.App.2d 669 [74 P.2d 807]; see, also, *Estate of Gaines,* 15 Cal.2d 255, 260 [100 P.2d 1055].)

Section 15a of the Bank Act (Stats. 1909, p. 87, as amended; 1 Deering's Gen. Laws, Act 652, at p. 210) provides in part: "When a deposit shall be made in any bank by any person or persons whether minor or adult in the names of such depositor or depositors and another person or persons, and in form to be paid to any of them or the survivor or survivors of them, such deposit and any additions thereto made by any such persons after the making thereof, shall become the property of such persons as joint tenants, and the deposit together with all dividends or interest thereon, shall be held for the exclusive use of such persons and may be paid to any of them during their lifetime or to the survivor or survivors after the death of one or more of them, and such payment and the receipt or acquittance of the person or persons to whom such payment is made shall be valid and sufficient release and discharge to such bank for all payments made on account of such deposit prior to the receipt by such bank of notice in writing not to pay such deposit in accordance with the terms thereof. The making of the deposit in such form shall, in the absence of fraud or undue influence, be conclusive evidence, in any action or proceeding to which either such bank or the surviving depositor or depositors may be a party, of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors."

There have been several important cases dealing with the presumptions that exist in connection with joint tenancy accounts. When a joint tenancy account is created in the form prescribed by section 15a of the Bank Act, a conclusive presumption arises, in the absence of fraud or undue influence, in favor of the survivor as to his title and right to any funds remaining in the account upon the death of the other joint depositor. This is so unless after the death of the depositor who was the original owner of the fund, there shall be proof that the account was opened without his knowledge and consent, express or implied. However, it is merely a rebuttable presumption in any contest between the depositors during their joint lives, and also is rebuttable after the death of either as to moneys previously withdrawn from such account. In these latter two instances, proof may be received that the tenancy created was in truth something different from the character of the tenancy defined by the legal presumption. (*Wallace*

v. *Riley,* 23 Cal.App.2d 654 and 669 [74 P.2d 800, 807]; *Moskowitz* v. *Marrow,* 251 N.Y. 380 at pp. 396-397 [167 N.E. 506, 66 A.L.R. 870], and *Marrow* v. *Moskowitz,* 255 N.Y. 219 at p. 221 [174 N.E. 460]. See the majority and dissenting opinions in *Walsh* v. *Keenan,* 293 N.Y. 573 [59 N.E.2d 409].)

It is also the law of this state, contrary to the rule in some states, that if money is withdrawn from a joint account by one depositor without the consent of the other, property acquired by the money so withdrawn, *or another account in which the money is traced,* will retain its character as property held in joint tenancy like the original fund, unless there has been a change in the character by some agreement between the parties. This has been the law of California for many years. (*Estate of Harris,* 169 Cal. 725 [147 P. 967]; *Estate of Harris,* 9 Cal.2d 649 [72 P.2d 873]; *Wallace* v. *Riley,* 23 Cal.App.2d 669, 677 [74 P.2d 807]; *Young* v. *Young,* 126 Cal.App. 306 [14 P.2d 580]; *Estate of McCoin,* 9 Cal.App.2d 480 [50 P.2d 114]; *Lagar* v. *Erickson,* 13 Cal.App.2d 365 [56 P.2d 1287]; *In re Kessler,* 217 Cal. 32 [17 P.2d 117]; *Chamberlain* v. *Chamberlain,* 2 Cal.App.2d 684 [38 P.2d 790]; *Wheeland* v. *Rodgers,* 20 Cal.2d 218 [124 P.2d 816]; but see *Pedder* v. *Commissioner of Internal Revenue,* 60 F.2d 866; notes 28 Cal.L.Rev. 224; 10 So.Cal.L.Rev. 119.) The rule is contrary to that in many states where the rule is that when one joint tenant withdraws the whole or any part of the account the unity of interest essential to a joint tenancy has been destroyed and the parties become tenants in common of the fund in equal shares. Under this rule the person who is innocent can hold the withdrawing joint tenant as trustee only for one-half of the fund. (*Goc* v. *Goc,* 133 N.J.Eq. 206 [31 A.2d 335]; *Stout* v. *Sutphen,* 132 N.J.Eq. 583 [29 A.2d 724]; see annotation 77 A.L.R. 799.) However logical and fair this last rule may seem to be, and I personally believe the rule in California is wrong and the rule in New Jersey is sound, the rule in this state is that where one joint tenant improperly withdraws the fund without consent, the innocent joint tenant may trace the fund and impose a trust on the entire fund which remains a joint tenancy fund. If there is to be a change in that rule at this late date it should be accomplished by the Supreme Court and not by a lower appellate court.

How do these rules apply to this case? Before plaintiff can recover he must prove that the original account between him and Mrs. Coffin was a joint tenancy account, and he must

trace the funds from that account into the five accounts between Mrs. Coffin and defendant. Inasmuch as the money here involved was withdrawn during the lives of the joint depositors, under the rules already discussed, the presumption arising from the form of the deposit that the account was one in joint tenancy is rebuttable, and evidence would be admissible to prove that that account was not a true joint tenancy account, but that Mrs. Coffin and plaintiff had agreed that it should have a different character and effect. That agreement can, of course, be shown by actions and conduct as well as by words. The defendant contends that, regardless of whether plaintiff was guilty of laches or whether the cause is barred by the statute of limitations, that the presumption that the account was a true joint tenancy, as a matter of law, was rebutted. In this connection defendant relies on certain facts and circumstancs not necessary to here set forth that undoubtedly would support an inference that the account between Coffin and plaintiff was not a true joint tenancy account. But the trial court did not so find. It found that the account was a joint tenancy account. Defendant as the winning party in the court below is in no legal position to attack that finding on this appeal. Moreover, the rebuttable presumption involved supports the finding. As was said in *Lieber* v. *Rigby,* 34 Cal.App.2d 582, 584 [94 P.2d 49], in answering the identical argument: ''At least since the decision of our Supreme Court in *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540 [299 P. 529], our courts are committed to the rule that a rebuttable presumption is a species of evidence which standing alone will support a finding against contradictory evidence produced by the other party. The finding of the trial court that the account was one in joint tenancy is therefore sufficiently supported by the presumption based on the voluntary act of the deceased husband in creating the account, even though appellants' evidence in the absence of the presumption might compel the opposite conclusion.''

The same legal situation exists as to the tracing of the funds into the five joint tenancy accounts in the names of Coffin and defendant. The evidence would support a finding either way on that issue. The trial court found that the money wrongfully withdrawn from the Coffin-plaintiff account found itself into these five accounts. So far as this appeal is concerned it must be held that such finding is supported and that defendant cannot attack it.

Now, having stated the facts and the general law applicable to this appeal, let us see if there is any reasonable basis for the holding in the majority opinion that the cause of action is barred by section 338, subdivision 4, of the Code of Civil Procedure. Before this properly can be done the nature of the cause of action involved in this case must be more particularly analyzed.

When Mrs. Coffin withdrew the entire balance in the Coffin-plaintiff account her act of withdrawal constituted a fraud upon plaintiff. (*In re McCarthy's Estate,* 164 Misc. 719 [299 N.Y.S. 715, 721].) On that date Mrs. Coffin became an involuntary trustee of those funds for the benefit of plaintiff, subject to her rights as a joint tenant. (Civ. Code, § 2224.) When, at a later date, she opened the joint accounts with the defendant herein and allegedly deposited the money therein, the defendant likewise became a constructive trustee as to these funds. This is so although there is no evidence in the record of any fraud on the part of defendant in regard to the said funds, nor are there any allegations to that effect, and there is no evidence that at the time the money was deposited in the joint accounts with defendant, the defendant had any knowledge of the source of the money or of any rights the plaintiff may have had therein. (*Airola* v. *Gorham,* 56 Cal. App.2d 42 [133 P.2d 78].) There the court stated (p. 45): "It is unquestionably the law that upon the transfer of trust property to a stranger to the trust the transferee becomes an involuntary trustee. . . . The wife, though an innocent donee, being the beneficiary of her husband's fraud, takes the property charged with the fraud so as to impress a trust upon it in her hands."

Under this rule, if the money can be traced in defendant's hands, plaintiff can recover a judgment against defendant although the defendant may have spent or otherwise dissipated the money. The general rule is stated as follows in 2 Scott on Trusts, page 1617, section 292.2: "If a trustee in breach of trust gives trust money to a donee, the fact that the donee spends the money before he has notice of the trust is ordinarily no defense. It is sufficient if the beneficiaries of the trust show that the money was paid in breach of trust and that no consideration was given for it. If this is shown, the donee is called upon to account for the amount which he receives. The donee, to be relieved of liability, must show that before he had notice of the breach of trust he so changed his position that it

would be inequitable to hold him liable. The mere fact that he has spent the money is not a defense. It is no defense where it appears that the money was spent by the donee on ordinary living expenses. If, however, he made extraordinary expenditures with the money which he would not have made if he had not received the money, this may well be such a change of position that it would be inequitable to hold him liable.'' This is likewise the rule of the Restatement. (See 2 Rest. Trusts, § 292, particularly comment J.)

Now when does the statute of limitations start to run on such a cause of action? The general rule, in regard to constructive trusts, is that the period of limitations begins to run upon the doing of the wrongful act by which the trust was created, no repudiation being necessary to set the statute in motion. (25 Cal.Jur. § 135, p. 274.) However, there is an exception to this rule, stated in 25 California Jurisprudence, at page 275, as follows: ''In some circumstances, the currency of the statute commences, not at the time of the wrongful act by which the trust was created, but only at a subsequent date when the plaintiff became cognizant of the facts. If the trustee concealed his wrongful conduct, the running of the statute is postponed.''

The evidence does not show that the defendant gave any consideration to Mrs. Coffin for the transfer of the funds in question to the several joint tenancy accounts standing in their names. It is clear, therefore, that this is a case wherein the exception should apply. As was said in *Airola* v. *Gorham, supra,* page 46: ''The transfer of trust property to a stranger being a conveyance in fraud of the beneficiary's rights should on principle follow the same rule [referring to the above-mentioned exception]. .... To hold that where the gift was made secretly to an innocent donee the statute would at once commence to run might well result in barring the cause of action before its discovery by the defrauded party. We are satisfied that this is not the law. . . .'' It is clear, therefore, that the statute of limitations in the instant case did not start to run until plaintiff knew or should have known of Mrs. Coffin's fraudulent act of depositing the funds in the Coffin-defendant accounts.

The trial court found that plaintiff had the means of knowledge since June of 1927 of the deposits and withdrawals in his joint account, and the same finding is made as to the Coffin-Alpi account opened in May of 1929. But when it comes to

the five accounts here involved, the court finds that plaintiff did not have the means of knowledge concerning these accounts until September 16, 1937, when the safe deposit box was opened. The differences between these findings is quite important, and cannot be overemphasized. This is not an action against Mrs. Coffin or her estate. We are not here interested in knowing when the statute started to run in her favor. We are here required to ascertain when the statute started to run against plaintiff on his cause of action against defendant, the donee of the fraudulent trustee. In passing, it should be noted that it is obvious that plaintiff had the legal right to inquire at the bank concerning his joint account, and, had he done so, he would have discovered Mrs. Coffin's fraudulent act of withdrawing the funds on May 27, 1929. It is therefore quite clear that plaintiff has had the means of knowledge of that fraudulent act since 1929. But to start the statute running even against her the plaintiff must not only have had the means of knowledge, but there must be a duty to inquire. These two persons were friends. Plaintiff was Mrs. Coffin's lawyer. He had no reason to believe that she was dishonest. He was not required at his peril to assume his trusted friend and client was a rogue. There can be no doubt at all that plaintiff was under no duty to make inquiry until, at the earliest, the death of Mrs. Coffin. Now what did he discover on September 16, 1937? He discovered that his trusted friend and client had been guilty of a fraud and that she had improperly closed out their account. He also was reasonably put on knowledge that the withdrawn account had been deposited in the account of Mrs. Coffin and her sister, and that that account had been partially closed out in July of 1935. There were a lot of other bank books in the safe deposit box, but can it be held that he was then placed under a duty of inquiry, or that he had the means of knowledge, that some of these books may have included the money originally withdrawn from his account? Most of these accounts were in fictitious names. The amounts withdrawn from the Alpi account were not identical with the balance in plaintiff's account, nor were the deposits made in defendant's accounts identical in amount with the withdrawals from the Alpi account. The dates of withdrawal—July 3rd and 6th—and the dates of the new deposits—July 3rd and 5th—are most confusing. Not only were the various names used by Mrs. Coffin fictitious, but the various names used by defendant were fictitious. What means of knowledge did plain-

tiff then possess? He had no lawful right to the various pass books, having not yet been appointed executor. He had no lawful right to make inquiry at the banks until October 14, 1937. How can it be held that on September 16, 1937, he had either the means of knowledge or that he was then under a duty of inquiry so far as defendant is concerned? The answer is obvious. It was not until October 14, 1937, when plaintiff was appointed and qualified as executor, that he was put on inquiry concerning these accounts.

The law applicable to such a factual situation has been so recently stated by the Supreme Court that it would be needless repetition to do more than quote from the most recent opinion of that court on this subject. In *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], it is stated (p. 437):

"Defendants assert that in addition to these requirements plaintiff must show that he made a diligent inquiry to discover whether or not he had been defrauded, and they argue that plaintiff failed to prove that earlier inquiry would not have revealed the falsity of the alleged representations. It is not in every case, however, that a person is barred after three years by failure to pursue an available means of discovering possible fraud. The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry. Section 19 of the Civil Code provides: 'Every person who has actual notice of circumstances *sufficient to put a prudent man upon inquiry* as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.' (Italics added.) Under this section it was held in *Tarke* v. *Bingham,* 123 Cal. 163 [55 P. 759], that the plaintiff was not barred by subdivision 4 of section 338 of the Code of Civil Procedure, since nothing had occurred 'to excite his suspicion, or to put him upon inquiry.' (123 Cal. at p. 166.) The court said: 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances "a prudent man" would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery. *The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.*' (Italics added.) Many other decisions have adopted this view. [Citing cases.] In many cases it has been said that

means of knowledge are equivalent to knowledge. [Citing cases.] This is true, however, only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious. In the Lady Washington case, the court said (113 Cal. at p. 487 [45 P. 809]) that 'as the means of knowledge are equivalent to knowledge, *if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry* which, if followed, would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of these facts.' (Italics added.)

"The reason for the rule is well stated in *Victor Oil Co.* v. *Drum, supra* (184 Cal. at p. 241 [193 P. 243]) : 'The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part.' It follows that plaintiff is not barred because the means of discovery were available at an earlier date *provided* he has shown that he was not put on inquiry by any circumstances known to him or his agents at any time prior to the commencement of the three-year period ending June, 1941."

This case has definitely determined that where there is no duty to investigate the statute does not start to run until the plaintiff has notice or knowledge of some incident or fact sufficient to arouse the suspicions of a reasonable person—that is, knowledge of some fact sufficient to make a reasonably prudent person suspicious of fraud.

It is clearly violative of the rules announced in this case to even suggest that plaintiff had means of knowledge or was under a duty to make inquiry, during a period of time that he was legally impotent to pursue such inquiry. For these reasons I am of the opinion that the statute did not start to run until October 14, 1937, and that the complaint filed as it was on October 11, 1940, was filed before the cause of action pleaded was barred.

Inasmuch as the majority opinion holds that the cause of action is barred by the statute of limitations it quite properly does not discuss the alternative ground of the trial court's

holding, namely, that plaintiff was barred by laches. The finding of laches is more or less predicated on the findings holding the cause is barred by the statute of limitations. Moreover, the defendant simply pleaded laches in her amended answer as a conclusion without setting forth any facts upon which the conclusion is based. Certainly the complaint does not disclose on its face that the cause is barred by laches. The rule is, that when a specific statute of limitations applies to an action, as it does in this case, mere delay alone for a period less than that provided by the statute will not bar the cause of action. (*Fry* v. *Board of Education*, 17 Cal.2d 753 [112 P.2d 229]; *Newport* v. *Hatton*, 195 Cal. 132 [231 P. 987]; *La Shells* v. *Hench*, 98 Cal.App. 6 [276 P. 377]; *Freeman* v. *Donohoe*, 65 Cal.App. 65 [223 P. 431]; see cases collected 10 Cal.Jur. § 64, p. 526.) In order for the defense to apply in such a case there must be some material prejudice to defendant caused by plaintiff's delay which could have been avoided had plaintiff been more diligent. Where these facts do not appear on the face of the complaint they should normally be pleaded by defendant as a defense, and appropriate findings should be made.

Defendant's principal argument in support of the challenged finding is that plaintiff should have commenced the action before Mrs. Coffin died, and that she suffered material prejudice by plaintiff's failure to commence the action prior to that date. The argument is unsound. As already pointed out in discussing the statute of limitations, under the facts of this case plaintiff was under no duty to inquire as to the status of the accounts during Mrs. Coffin's lifetime. The lapse of time up to her death is therefore immaterial. As I view the facts, the cause of action did not accrue until October 14, 1937. While it has frequently been stated that it is a material circumstance in determining whether laches exist that the claim was not made until after the death of a person who could have explained the transaction (see cases collected 10 Cal.Jur. § 70, p. 532) such circumstance, under the facts here involved, where there was no duty to investigate prior to such death, does not support the finding of laches. The duty to act or inquire must exist before the cause of action accrues. The true rule is set forth in *Maguire* v. *Hibernia S. & L. Soc.*, 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062], as follows: "Where, for example, an action is commenced many years *after its accrual*, the death of witnesses or destruction of evidence, pre-

sumed as well as actual, may prejudice the defendant and justify denial of relief because of staleness of the claim.''

The trial court also found that plaintiff as executor delivered the pass books to defendant, allowed defendant to secure the money, and compromised state and federal tax claims against the property. No particular facts are found or set forth. This is an equity action. If the prejudice to defendant based on these facts is so material that plaintiff is barred, those facts must appear. But if the financial loss of defendant is small, this being an equity action, the trial court possesses full power to offset any such loss against plaintiff's recovery, if plaintiff is found entitled to recover.

For these reasons I am of the opinion that the cause of action pleaded is barred neither by limitations nor laches, and that the cause should be retried on its merits.

Appellant's petition for a hearing by the Supreme Court was denied July 15, 1946. Gibson, C. J., and Carter, J., voted for a hearing.